UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| National Pasteurized Eggs, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.    1:07-CV-103-JL |
| v. ) | |
| ) | |
| L. John Davidson, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

National Pasteurized Eggs, LLC ("NPE"), by its attorneys, respectfully submits the within Memorandum of Law in support of its Objection to Defendant's Motion for Summary Judgment.

**I.     INTRODUCTION**

Defendant L. John Davidson asserts in his Motion for Summary Judgment that there is no basis for NPE's ownership of the '784 Patent and foreign rights,[1] that he is the sole owner of the Jumbo by virtue of its issuance in his name by the USPTO,[2] and that NPE's claim to ownership is time-barred.

Davidson's various unsupported arguments in his summary judgment motion do not hold water. First, he confuses patent ownership with patent inventorship, which does not confer

---

[1] US Patent Application No. 10/084,444, which ultimately issued as US patent No. 6,692,784 will be referred to as the "'784 Patent" or Jumbo. PCT/US02/05771, the foreign equivalent of the '444 application from which all non-US patents are derived, and the foreign applications in Canada, EPO and Japan (APPs 17-20 in the Amended Complaint) will be collectively referred to as the "foreign rights."

[2] On page 9 of Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment, Davidson also states "a new agreement was reached between the defendant and PEC establishing ownership of the subject patent was in the defendant." As this assertion lacks any factual support, NPE need not address it here. See Global Naps v. Verizon New England, Inc., No. 09-1308, at n.23 (1st Cir. April 29, 2010) (information not provided in admissible pleading should not be considered for purposes of summary judgment).

1758610.2                                                    1

ownership; in granting the patent application, the USPTO made no determination of ownership. Second, NPE's ownership of the '784 arises not only from the July 23, 2003 bankruptcy sale order, but from pre-bankruptcy assignments of IP from Davidson to Pasteurized Eggs Corporation ("PEC"), which automatically vested ownership in PEC. Davidson contends that these agreements were breached, which confirms that the statute of limitations has expired on his claims of ownership. Third, his assertion of the statute of limitations defense has been waived by his failure to plead it in his amended answer. Even were the defense available to Davidson at this late stage, it would not have expired against NPE, which filed this lawsuit in response to Davidson's interference with NPE's patent rights. See Amended Complaint (Doc. 30) ¶ 22.

## II.   FACTS

Davidson's motion is based on the faulty and disputed premise that he prosecuted to conclusion his title to the '784 Patent in the USPTO. Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s Memorandum") at 7. Davidson prosecuted his patent application to conclusion, but title to the patent was never addressed by the USPTO—under 35 U.S.C. § 261, patents are treated as personal property, and ownership thereof is governed by state law. See Akazawa v. Link New Tech. Int'l, Inc., 520 F.3d 1354, 1357 (Fed. Cir. 2008).

Davidson also asserts the '784 Patent, or Jumbo, was never transferred to PEC upon PEC's failure to make required payments, (Def.'s Memorandum at 6), and that the only mechanism by which PEC could have received title was the Wagner assignment. Id. at 5. NPE disputes these contentions. Davidson assigned ownership of the Jumbo to PEC in his January 1, 2001 Employment Agreement, as well as the September 2001 Global Settlement Memorandum ("GSM"). There is some question as to whether the GSM was properly executed, as the only

version in the record was signed by Davidson only. To the extent Davidson claims ownership of the Jumbo as "new inventiveness" under the GSM, his claim cannot be resolved on summary judgment, as Davidson acknowledged in his recent deposition that there was more than one version of the GSM, and he has not demonstrated that the version he signed and has produced was signed by anyone else. See Exhibit 1, Davidson Depo. at 255-56 (Davidson testifies that he has never seen "the executed GSM"); Id. at 337 ("I don't know that anybody, including Best[,] signed it for that matter. All I know is that I signed it."). The content of the Jumbo patent had been conceived and developed prior to 2001, which vested ownership in PEC by way of the Employment Agreement. Likewise, even if the GSM was validly executed, the Jumbo would constitute "old inventiveness" thereunder, which was the property of PEC and transferred to NPE in the Bankruptcy Court Sale Order of July 25, 2003.

### III. ARGUMENT

#### A. *Davidson's Inventor Status in the PTO Does Not Make Him Owner of the '784*

Davidson claims that upon issuance of the '784 listing him as the inventor, on February 17, 2004, "no further action was required on behalf of the defendant to perfect his ownership of the patent." Def.'s Memorandum at 4; See Id. at 7 (claiming that Davidson "prosecute[d] to conclusion his title to the patent before the PTO"). This argument, presented without any legal authority, is erroneous. Indeed, as Davidson acknowledges in his summary judgment objection: "It is elementary that inventorship and ownership are separate issues." Beech Aircraft Corp. v. EDO Corp., 990 F.2d 1237, 1248 (Fed. Cir. 1993).

The fact that Davidson is listed by the PTO as inventor of the '784 is a red herring. As the Federal Circuit observed in Beech Aircraft, "[a]n application for a patent must be made by or on behalf of the actual inventor or inventors of the subject matter claimed therein." Id. (citations

omitted). Thus, NPE could not and cannot be listed as the patent inventor, regardless of its property interest. "Ownership, however, is a question of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property." Id. (citing 35 U.S.C. § 261).

Patent ownership—but not inventorship—can be dictated by, inter alia, contract or court order, either of which may dictate ownership before or after issuance of the patent. See, e.g., Caterpillar Inc. v. Sturman Indus., 387 F.3d 1358, 1365-66 (Fed. Cir. 2004) (district court, although reversed on unrelated grounds, required sole inventor to assign patent ownership based on contractual assignment); Regents of Univ. of New Mexico v. Knight, 321 F.3d 1111, 1119-20 (Fed. Cir. 2003) (inventors were obligated to assign patents by pre-issuance contracts); Viskase Corp. v. Am. Nat'l Can Co., 261 F.3d 1316, 1328 (Fed. Cir. 2001) ("Inventors who have an obligation to assign their inventions have no ownership interest in the patents on those inventions.").

Consequently, Davidson's argument based on his inventorship of the '784 patent does not play out in his favor, as NPE obtained ownership by operation of the bankruptcy sale order and prior contractual assignment. Although Davidson, after the Sale Order, succeeded in deleting the Wagner claims, which had separately been assigned to PEC prior to the Bankruptcy Sale Order, the deletion of the Wagner claims and issuance of the patent in Davidson's name did nothing to eliminate NPE's ownership interest obtained from the Employment Agreement, GSM, or Bankruptcy Sale Order.

NPE notes that Davidson's claim to ownership based on PTO inventor status also does nothing to support a claim to ownership of the related foreign patent rights at issue, APPs 17-20. It is undisputed that Myron Wagner assigned to PEC his interest in the '784 patent together with

all foreign rights (Exhibit 2), and that Wagner's claims were never excluded from the foreign '784 patent applications. Davidson's evidence of the exclusion of Wagner relates only to the United States patent, not the foreign rights. Thus, NPE must be declared the owner of the foreign applications.

> B.  *NPE's Claim to Ownership of the '784 is Not Time-barred*

Davidson asks this Court to preclude NPE's ownership claim based on the three-year statute of limitations in New Hampshire RSA 508:4. Def.'s Memorandum at 8. This argument has been waived by Davidson's failure to assert it in his amended answer. In addition, Davidson's assertion that the statute of limitations began to run upon issuance of the patent, and thus expired prior to initiation of this lawsuit, is baseless.

Fed. R. Civ. P. 8(c)(1) requires a party to "state any avoidance or affirmative defense," and specifically identifies the statute of limitations as an affirmative defense. Simply put, Davidson's failure to plead the statute of limitations as an affirmative defense results in a waiver of the defense. See Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F. 3d 2, 11 (1st Cir. 2005). Although Davidson erroneously suggests that NPE asserted the statute of limitations for the first time in its summary judgment motion, See Def.'s Memorandum at 5, NPE pleaded the statute of limitations over two years ago, in its Amended Answer to Defendant's Counterclaims (Doc. 33), at 9 ¶ 60.

Davidson's statute of limitations argument is also substantively defective. He claims that NPE's action is "in the nature of a breach of contract action," which arose upon "issuance of the patent in the defendant's name." Def.'s Memorandum at 8. As discussed above, issuance of the '784 with Davidson as the inventor of record did nothing to undermine NPE's ownership rights therein. Davidson filed a complaint on July 8, 2003 in the Bankruptcy Court to assert his claim

to ownership (while the proposed sale to NPE was pending), but voluntarily dismissed it without prejudice, over NPE's objection, on August 27, 2003.

Davidson re-filed his Complaint in this Court on that same day, even though the PTO had already deleted Myron Wagner's claims from the '784 patent application, leaving Davidson as the sole inventor of record. Because Davidson voluntarily dismissed the complaint on February 4, 2004, NPE did not have reason to defend its ownership of the '784 until 2007, when Davidson's noncooperation caused NPE to lose its Italian rights to the '784 IP, and jeopardized its other overseas patent prosecutions. See Amended Complaint (Doc. 30) ¶ 22. NPE's ownership in the '784 had already vested, by virtue of the bankruptcy sale order and pre-bankruptcy assignment from Davidson to PEC.

   C. ***Davidson's Challenge to NPE's Ownership of the '784 is Time-barred***

The Bankruptcy Sale Order transferred title of the '784 to NPE - not to Davidson. Davidson takes the contrary position, asserting that PEC had no interests in the '784 that could be conveyed to NPE. Def.'s Memorandum at 5. As a starting point, the Bankruptcy Sale Order by its very definition purported to "convey" PEC's assets, including the '784, to NPE. Davidson's claims, on the other hand, were acknowledged to avoid precluding him from asserting them in a subsequent action. As explained in Plaintiff's Motion for Summary Judgment, Davidson did so in August 2003, but voluntarily dismissed the action in early 2004 and never again brought a legal claim for ownership of the '784. Any claim he might seek to bring henceforth would be well outside the applicable three-year statute of limitations.

While the Bankruptcy Sale Order permitted Davidson to assert title to the '784 in a later proceeding, it also put Davidson on notice that PEC asserted title thereto and was selling the '784 and foreign rights to NPE. In particular, the Sale Order embraced the Asset Purchase

Agreement ("APA") between PEC and NPE, which warranted that "good, valid and marketable title to all of the Assets . . . shall be transferred to the Buyer, free and clear of all Liens and other property interests . . . . " (Exhibit 3 at 8). On top of the clear distinction between patent inventorship and patent ownership, this, too, belies Davidson's claim that he "did not need to resort to litigation to reacquire title to the subject intellectual property." Def.'s Memorandum at 6.

A contract-based challenge to NPE's ownership would also be time-barred. Davidson suggests that because his contracts with PEC were breached, he was not bound "by any obligation [he] may have had to transfer the subject intellectual property to PEC." Def.'s Memorandum at 6; see also Id. ("defendant did not need to resort to litigation to reacquire title to the subject intellectual property, as it was never transferred to PEC upon PEC's failure to make payments"). This argument confirms that Davidson's own ownership claim is time-barred, as it rests on PEC's breaches of Davidson's employment agreement, and the Global Settlement Memorandum ("GSM"), which he claims occurred in 2003. See Def.'s Memorandum at 6, 9, 10 (breach "at the inception"). These contracts were "automatic assignments" that, upon formation, conveyed the inventiveness underlying the '784 to PEC, and enabled the subsequent sale of this IP to NPE through the bankruptcy sale order. Davidson thus lost his right to contest the transfer of ownership by way of a breach of contract action three years from the alleged breach, or at least no later than three years from the bankruptcy sale order.

### D. *Davidson Assigned Ownership of the '784 to PEC*

Examination of the Employment Agreement and GSM also reflects that NPE is entitled to judgment as a matter of law on its claim to ownership of the '784. See Czumak v. N.H. Div. of Developmental Servs., 155 N.H. 368, 373 (2007) (interpretation of a contract is a question of

law); Markman v. Westview Instr., Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995) (determination of meaning and scope of patent claims is a matter of law).

Under both the January 2001 Employment Agreement and GSM, PEC owned the '784 patent, by assignment from Davidson, prior to bankruptcy. Davidson concedes this in his Memorandum, as he takes the position his obligation to transfer the IP to PEC was "abrogated" upon PEC's breach and Jumbo was never transferred to PEC upon PEC's failure to make required payments. Def's Memorandum at 6. These admissions reveal that Davidson agrees the Jumbo was transferred by the agreements; he tries to avoid that result by alleging a breach by PEC in 2001.

The Employment Agreement specifically addresses PEC's proprietary rights in Davidson inventions. "Inventions" was defined as "all inventions, improvements, developments, methods, processes and ideas." Exhibit 4 at 3, ¶ 6. The Employment Agreement provided "Inventions conceived, developed or reduced to practice (or tested or used by the Company at a Company facility, including a facility of a Company contractor or licensee, or which has been the subject of a patent application) prior to January 1, 2001 shall be the Company's exclusive property as against you." Id.

As Davidson has pointed out, by the express terms of the GSM, the Employment Agreement was to be superseded, if the GSM was validly executed, which has not been established. (Exhibit 5 at 1 ¶ 1(a).) The GSM provided "new processes or intellectual property ("Inventiveness") developed prior to January 1, 2001 ("Old Inventiveness"), including a method for extending the shelf life of eggs, *shall be the property of PEC* . . . ." Exhibit 5 at 2, ¶ 1.c. The GSM required that Davidson "shall take such actions as may be reasonably required by PEC to assist PEC to complete the development, improvement, documentation, protection and

patenting of such Old Inventiveness." Id. This provision was an automatic assignment of pre-2001 inventiveness from Davidson to PEC.

> The question of whether or not an agreement provides for automatic assignment is a matter of federal law. If the contract expressly grants rights in future inventions, `no further act [is] required once an invention [comes] into being,' and `the transfer of title [occurs] by operation of law.'" Here, the agreement provides that "[t]he Employee assigns all of his or her right, interest, or title in any Invention to the Employer to the extent allowed by law." By using the language "Employee assigns," the employee-assignment agreement expressly grants rights with no further action needed on the part of the employee. Therefore the provision is one of automatic assignment.

Sirf Technology v. Int'l Trade Comm., 601 F.3d 1319, 1326 (Fed. Cir. 2010) (citations omitted); accord DDB Techs., LLC v. MLB Advanced Media, L.P., 517 F.3d 1284, 1290 & n.3 (finding automatic assignment where the agreement used "the present, automatic" language "agrees to and does hereby grant and assign"). Because the GSM did not require Davidson to "grant rights in the future," and required "no further act . . . on the part of" NPE, it was an automatic assignment. See DDB Techs., 517 F.3d at 1290. Accordingly, PEC transferred exclusive legal title to NPE via the Bankruptcy Sale Order.

Paragraph 1.d. of the GSM provides that "New Inventiveness" "shall be the property of" Davidson. Exhibit 5 at 2. Note that paragraph 1.d gives Davidson an ownership interest in New Inventiveness, without divesting NPE of its preexisting ownership of Old Inventiveness, and without declaring Davidson the exclusive owner of any new *patents*. Moreover, had Davidson truly developed inventiveness in the '784 on or subsequent to January 1, 2001, he would have submitted an affidavit attesting to his specific efforts, including what he did, where he did it, and when he did it, and offering credible documentation reflecting his work. Davidson's silence on this is telling. In any event, the undisputed evidence reflects that the '784 contains no New Inventiveness.

The "invention(s)" that eventually issued in the '784 patent were conceived prior to January 1, 2001, developed prior to January 1, 2001, reduced to practice prior to January 1, 2001, and even tested at PEC facilities prior to January 1, 2001.  Davidson's own words show this to be the case.  In short, the Jumbo was based on the provisional '726 application filed in February 2001, which consisted of pre-2001 inventiveness belonging to PEC.  See Exhibit 1, Davidson Deposition at 135 lines 18-23 (indicating that the '726 provisional application "described the new inventiveness that was in the 444 [Jumbo] application"); Id. at 231 lines 4-11 (indicating that egg pasteurization was conceived earlier than 2001).

On November 14, 2000, Davidson wrote an inventor's disclosure letter in the form of a detailed memorandum to PEC's attorney Fred Whisenhunt regarding "Current Technology."  In the succeeding six pages, Davidson explained "our current learnings as applied to our pasteurization technology and processing." (Exhibit 6).  In seeking to convince PEC's patent counsel that the new invention was sufficiently developed that a patent application was justified, Davidson even asserts that the "new equipment [is] nearing completion" and further describes "successful test results in the single tank with three zones of different temperature."   The temperatures discussed in the Memorandum are within the specific ranges covered in the '784 patent when it eventually issued.  The Memorandum reflects tested temperatures of up to 139 degrees for the first bath (within the '784's range of 139-146); 133 degrees for the second bath (within the '784's range of 130-135); and up to 135 degrees for the third bath (within the '784's range of 135-138).  Compare Exhibit 6, at 3-4; with Memorandum of Law in Support of Def.'s Objection to Plaintiff's Motion for Summary Judgment at 5.  Davidson explains other specific improvements in the Memorandum that were also in the '784 patent when it issued, i.e., eliminating the cold water bath, the benefit of natural cooling in the process, the prompt anti-

bacterial treatment of the eggs upon exit, and the application of a protective sealant.  Exhibit 6.  Davidson confirmed in his deposition that he was exploring "areas of potential new inventiveness in the second half of 2000, "four to five months" before the provisional filing on February 28, 2001.  Exhibit 1, Davidson Depo. at 120 lines 11-21.  The '726 provisional patent application employs the exact same language as the November 2000 memorandum in describing the inventiveness.  See Exhibit 7.

Other documents submitted by Davidson confirm the '784 patent was conceived and tested, and also developed and put into practice, before January 1, 2001.  In the August 19, 2001 Memorandum from Davidson to Daniel Best, Davidson admits "the new technologies [were] developed by me in the second half of year 2000 and 2001."  See Exhibit J to Davidson's summary judgment motion; Exhibit 1, Davidson Depo. at 134 lines 5-23.  Davidson's March 27, 2001 Confidential Report to PEC Board of Directors also notes "the methodology employed to reduce the risk of recontamination through the use of antibacterial agents employed post pasteurization is the subject of a new application for protection."  See Exhibit F to Davidson's summary judgment motion.

IV.   **CONCLUSION**

Davidson admits that he transferred the Jumbo (U.S. and foreign rights) to PEC when executing the Employment Agreement.  To the extent the GSM was validly executed, it too constituted an automatic transfer to PEC.  PEC sold Jumbo to NPE, which was approved by the Bankruptcy Court Sale Order.  Davidson's efforts to try to eliminate Wagner from the patent application process and to press his application with the USPTO, did nothing to establish ownership.  Davidson clearly recognized that he was obligated to assert his claim to title, which he twice undertook with federal lawsuits, but each time he withdraw the suit.  Davidson's

assertion that NPE is untimely in bringing this action when he reemerged in 2007 is without merit.  It is Davidson's challenge, asserting a breach by PEC in 2001, that is untimely.

For the reasons set forth above, in its Motion for Summary Judgment, and in its Reply to Davidson's summary judgment Objection, National Pasteurized Eggs, Inc. respectfully requests that this Honorable Court grant its Motion for Summary Judgment and deny Defendant's Motion for Summary Judgment.

>
> Respectfully submitted,
>
> NATIONAL PASTEURIZED EGGS, LLC
>
> By its attorneys,
>
> PRETI FLAHERTY BELIVEAU & PACHIOS, PLLP

Dated: September 8, 2010

/s/ Peter G. Callaghan
Peter G. Callaghan, NH Bar #6811
P.O. Box 1318
Concord, NH  03302-1318
(603) 410-1500
pcallaghan@preti.com

D.W. TOONE & ASSOCIATES, PLLC

/s/ D. William Toone
D. William Toone
6727 185th Avenue NE
Redmond, WA 98052
(425) 250-4195
bill@dwtoonelaw.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 8th day of September 2010 a copy of the foregoing *Objection to Defendant's Motion for Summary Judgment* was served on all counsel of record electronically via ECF.

                                            <u>/s/  Peter G. Callaghan</u>
                                            Peter G. Callaghan