UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| National Pasteurized Eggs, LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>L. John Davidson, )<br>)<br>Defendant. )<br>) | Case No.   1:07-CV-103-JL |

**PLAINTIFF'S REPLY TO DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO APPs 16-20 (THE "JUMBO")**

National Pasteurized Eggs, LLC ("NPE"), by its attorneys, respectfully submits the within Reply to Defendant's Objection to Plaintiff's Motion for Summary Judgment.

As Davidson's Amended Answer asserts that his ownership was derived from PEC's breach of both his employment agreement with PEC and the Global Settlement Memorandum with PEC, both dated in 2001, NPE moved for summary judgment that it is the owner of United States Patent '784 and the foreign applications (APPs 16-20 in the Amended Complaint) on the ground that Davidson's claims are barred by the statute of limitations.

In his Objection, Davidson appears to concede NPE's statute of limitations argument by not disputing it and advancing three new theories in support of his ownership claim that lack evidentiary or legal support.  The opposition fails as the issuance of the '784 patent with Davidson as the named inventor was not a determination of ownership, the invention was conceived and developed prior to January 2001—making it the property of PEC under agreements between Davidson and PEC, and Davidson's reliance on the statute of limitations is barred.

**1.  Inventorship and ownership of a patent are distinct.**

Davidson's argument that the mere issuance of the '784 patent by the USPTO listing him as the sole inventor also vested Davidson with legal ownership is without legal support and in error, as it is based on the faulty conflation of inventorship and ownership.  In the one case cited by Davidson, the Federal Circuit Court held that: "It is elementary that inventorship and ownership are separate issues."  Beech Aircraft Corp. v. EDO Corp., 990 F.2d 1237, 1248 (Fed. Cir. 1993).  In other words, a patent application "must be made by or on behalf of the actual inventor," but patents are treated as personal property for purposes of determining ownership.  Id. (citing 35 U.S.C. § 261).  Thus, patent ownership — but not inventorship — can be dictated by, inter alia, contract or court order, either of which may take place before or after issuance of the patent.  See, e.g., Caterpillar Inc. v. Sturman Indus., 387 F.3d 1358, 1365-66 (Fed. Cir. 2004) (district court order, although reversed on unrelated grounds, required sole inventor to assign patent ownership based on contractual assignment); Regents of Univ. of New Mexico v. Knight, 321 F.3d 1111, 1119-20 (Fed. Cir. 2003) (inventors were obligated to assign patents by pre-issuance contracts); Viskase Corp. v. Am. Nat'l Can Co., 261 F.3d 1316, 1328 (Fed. Cir. 2001) ("Inventors who have an obligation to assign their inventions have no ownership interest in the patents on those inventions.").

**2.  PEC owned the '784 patent and all foreign rights.**

NPE is reluctant to accept the invitation to engage in a substantive debate on 2003 PEC ownership issues because they could have and should have been resolved at least seven years ago.  Those factual disputes are now barred by the statute of limitations as a matter of law.  Nevertheless, and assuming arguendo that Davidson had timely raised his ownership arguments, Davidson could not prevail on his challenge to PEC's ownership based on his own prior

admissions.  That is likely why Davidson did not raise these issues when he was required to do so.

        a)  <u>PEC owned the '784 patent because it encompasses inventions conceived and developed prior to January 1, 2001.</u>

Under both the January 2001 Employment Agreement and the September 20, 2001 Global Settlement Memorandum, PEC owned the '784 patent prior to bankruptcy.  The Employment Agreement specifically addresses PEC's proprietary rights in Davidson inventions.  "Inventions" was defined as "all inventions, improvements, developments, methods, processes and ideas."  (Exhibit 1 at 3, ¶ 6.)  The Employment Agreement provided "Inventions conceived, developed or reduced to practice (or tested or used by the Company at a Company facility, including a facility of a Company contractor or licensee, or which has been the subject of a patent application) prior to January 1, 2001 shall be the Company's exclusive property as against you."  Id.  Davidson was also obligated to formally assign any such invention to the company under the Employment Agreement that further provided: "you will, upon the Company's request and at its expense (but without any additional compensation to you) execute all documents reasonably necessary to assign your right, title and interest in any such Invention (and to direct issuance to the Company of all patents or copyrights with respect thereto)."  (Id.)

PEC also owned the '784 patent under similar language in the September 20, 2001 Global Settlement Memorandum.  The Global Settlement Memorandum, as indicated on its face, was intended to resolve all of the pending disputes, including concerns with the language of the December 2000 Assignment, Davidson's claim that PEC had breached his Employment Agreement, the Delaware lawsuit over the removal of directors and compensation due Davidson.

The GSM provided "new processes or intellectual property ("Inventiveness") developed prior to January 1, 2001 ("Old Inventiveness"), including a method for extending the shelf life of eggs, shall be the property of PEC…"   (Exhibit 2 at 2, ¶1.c.)  The GSM required that Davidson "shall take such actions as may be reasonably required by PEC to assist PEC to complete the

development, improvement, documentation, protection and patenting of such Old Inventiveness." (Id.)

Had Davidson truly developed the inventiveness on or subsequent to January 1, 2001, a prerequisite to falling under Paragraph 1.d., he would have submitted an Affidavit attesting to his specific efforts, including what he did, where he did it, and when he did it and offering credible documentation reflecting his work. Davidson's silence on this is telling. Rather than providing sworn testimony and direct evidence on the point, Davidson provides partial documents that are taken out of context and that are misinterpreted by Davidson to suit his needs.

    b)  The November 14, 2000 invention disclosure memorandum to PEC attorney Whisenhunt.

The "invention(s)" that eventually issued in the '784 patent were conceived prior to January 1, 2001, developed prior to January 1, 2001, and even tested at PEC facilities prior to January 1, 2001. Davidson's own words show this to be the case.

The '784 patent claims as an invention "a process for pasteurizing in shell chicken eggs" with use of a single tank with multiple temperature zones of water heated between 128 and 145 degrees, after which the eggs are treated with an anti-bacterial agent and then a wax sealant. (Exhibit 3 at 1). On November 14, 2000, Davidson wrote an inventor's disclosure letter in the form of a detailed memorandum to PEC's attorney Fred Whisenhunt regarding "Current Technology." In the succeeding six pages, Davidson explained "our current learnings as applied to our pasteurization technology and processing." (Exhibit 4). In seeking to convince PEC's patent counsel that the new invention was sufficiently developed that a patent application was justified, Davidson even asserts that the "new equipment [is] nearing completion" and further describes "successful test results in the single tank with three zones of different temperature." Id.

This Memorandum was turned into the February 28, 2001 Provisional Application; a comparison of the two reveals the language is identical. (Exhibit 5). The temperatures discussed in the Memorandum (133-139 F) are specifically within the ranges covered in the '784 patent

when it eventually issued.  Davidson explains other specific improvement in the Memorandum that are also in the '784 patent when it finally issued, i.e., eliminating the cold water bath, the benefit of natural cooling in the process, the prompt anti-bacterial treatment of the eggs upon exit, and the application of a protective sealant. (Id.; Exhibit 3.)  Davidson's November 14, 2000 Memorandum describes what was set forth in the provisional applications and final patent application and what ultimately was allowed as the inventions claimed in the '784 patent.

Other documents submitted by Davidson affirm the '784 patent was conceived and tested, and also developed and put into practice, before January 1, 2001.  In the August 19, 2001 Memorandum from Davidson to Daniel Best, Davidson admits "the new technologies [were] developed by me in the second half of year 2000 and 2001."  (Exhibit J to Davidson's s summary judgment motion).  Davidson's March 27, 2001 Confidential Report to PEC Board of Directors also notes "the methodology employed to reduce the risk of recontamination through the use of antibacterial agents employed post pasteurization is the subject of a new application for protection."  (Exhibit F to Davidson's summary judgment motion).

> c)  Davidson originally admitted that the '784 patent was a continuation-in-part of the '505 patent filed in 1997, which was indisputably owned by PEC.

Prior to the PEC bankruptcy and prior to Davidson becoming concerned about taking PEC intellectual property for his own account, he filed the application that led to issuance of the '784 patent as a continuation-in-part of the '505 patent that he originally applied for in 1997. (Exhibit 6).  The '505 patent, together with all improvements, was assigned to PEC on December 29, 2000.  (Exhibit 7).

The rulings in the USPTO as reflected in the patent file history further evidence that the '784 Patent was not new inventiveness.  The patent examiner, on December 24, 2002, rejected the application due to the prior art and obviousness of the application.  (Exhibit 8). One of the patents relied on by the examiner in making the prior art rejection was the '505 Patent.  Id.

        d)       <u>At the time of the PEC bankruptcy, Davidson's own attorney at Birch Stewart law firm recognized PEC as the owner of the '784 patent.</u>

Upon the PEC Bankruptcy filing, on October 23, 2002 the Birch Stewart firm withdrew from the patent prosecution, explaining "We cannot get instructions from the assignee/client. The owners of the application are seriously in arrears in payments to our firm, and they have recently entered bankruptcy proceedings" and it directed mail be sent to Davidson. (Exhibit 9.) PEC asked another law firm to take over the prosecution, but later acquiesced to a Davidson request that the Birch firm resume work on the file. (<u>See</u> Exhibit 10, Declaration of James H. Rand, dated July 29, 2003, filed in the USPTO.) PEC did so upon the express agreement that PEC's interests would not be harmed (<u>Id.</u> at ¶ 9).[1]

### 3. The Sale Order transferred title to the '784 patent and foreign rights to NPE

When it became clear to PEC that it would be unable to pursue its plan of reorganization, it agreed to sell its assets to NPE and entered into an Asset Purchase Agreement, warranting that "good, valid and marketable title to all of the Assets…shall be transferred to the Buyer, free and clear of all Liens and other property interests…" (Exhibit 11 at 8). The '784 patent and foreign rights were listed on the schedule as assets being sold to NPE. (Exhibit 11 at Schedule 1.24). A motion to approve the sale was filed, (Exhibit 12), to which Davidson objected, asserting numerous claims that he owned certain assets. The Bankruptcy Court approved the motion and the sale of some assets free and clear of all liens, but approved the sale of others without resolving Davidson's claims. Where a claim to title is in dispute, 11 U.S.C. § 363(f) permits the Bankruptcy Court to sell property free and clear of any third party interest, but in this instance,

---

[1] Davidson nevertheless took action in the ex parte proceedings to nullify the Wagner assignment to PEC within just 5 days of that agreement without informing PEC. <u>Id.</u> at ¶10. As stated above, Davidson also filed his affidavit to remove Wagner without notifying the USPTO of the pendency of the bankruptcy court proceeding.

the Court permitted Davidson to preserve his claims to ownership for post-bankruptcy litigation. The subject assets were included on Schedule 1.24B-1 of the Sale Order. (Exhibit 12.)

The purpose of the Sale Order noting Davidson's claim was to put NPE on notice of what it was buying, and to avoid precluding Davidson from bringing his claims in a subsequent action. By embracing the Asset Purchase Agreement (APA) between PEC and NPE, the Sale Order also put Davidson on notice that PEC and NPE asserted title to the Jumbo. As explained in Plaintiff's Motion for Summary Judgment, Davidson failed to timely contest the transfer of the Jumbo to NPE, which entitles NPE to declaratory judgment in favor of its ownership thereof.

Davidson took advantage of numerous opportunities to challenge PEC's title in the assets transferred by the court. In addition to his Objection to the Proposed Sale Davidson filed an Adversary Complaint in the bankruptcy proceeding that essentially asserted the same arguments now appearing in Davidson's Amended Answer. Davidson filed a lawsuit in US District Court in New Hampshire seeking to be declared the owner of the '784 patent, but he failed to advance his challenge and elected to voluntarily dismiss the complaint.

This is a case where the statute of limitations is necessary to give finality, certainty and reliability to contracts as well as to court orders.

### 4.  Davidson has waived the statute of limitations argument against NPE

Davidson asserts that the administrative issuance of the '784 patent by the USPTO in which he is named as the inventor is conclusive on the issue of ownership regardless of prior assignments or bankruptcy court sale orders. Thus, Davidson asserts, it is NPE that is time barred by the statute of limitations, not Davidson. This argument is advanced with scant legal authority and is simply wrong on the law. Davidson's claim should also fail as Davidson did not timely raise statute of limitations as an affirmative defense against NPE.

Fed. R. Civ. P. 8(c)(1) requires a party to "state any avoidance or affirmative defense." A statute of limitations defense is listed as one of the defenses within the pleading requirement of Rule 8(c)(1). Simply put, Davidson's failure to plead the statute of limitations as an affirmative defense results in a waiver of the defense. See Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F. 3d 2, 11 1st Cir. (2005).

**5. Global Settlement Memorandum.**

Davidson advances the argument, without any credible evidence, that the '784 patent falls under Paragraph 1.d. of the 2001 Global Settlement Memorandum, which provides "inventiveness developed by LJD…on or subsequent to January 1, 2001 ("New Inventiveness") shall be considered the property of LJD and shall be dealt with as follows:…" (Exhibit 2.)

The Global Settlement Memorandum contemplated a more detailed settlement agreement would be prepared, but it does not appear this was accomplished. (See Exhibit 2 at 1.) Thus the language in the Memorandum is what the parties were left with to resolve the question of ownership of inventiveness. The Global Settlement Memorandum also contemplated that a number of individuals would sign it, but the only signature to be uncovered is Mr. Davidson's. There is no evidence at this point that anyone else signed the GSM and Davidson admitted in his deposition that he is unaware of any one of the other signatories actually signing it. (Exhibit 14 at 255-56, 337 ("I don't know that anybody, including Best[,] signed it for that matter. All I know is that I signed it."). There is also no evidence as to what version of the GSM was agreed to, and Davidson admitted in his deposition that there were multiple versions. (Id. at 253 line 19 - 254 line 5 ("I do know that there were several drafts.")). Thus, Davidson's reliance on the GSM for purposes of summary judgment is misplaced.

If a fully executed GSM surfaces, it does not advance Davidson's cause. It is undisputed that Davidson conceived, tested and developed before January 1, 2001 the "single tank with multiple temperatures" invention that ultimately became the '784 patent. Three of the provisional applications had already been filed by PEC, one was filed shortly thereafter, and the non-provisional application was filed in February 2002. Had there been any serious claim at that time that Davidson was the owner of what became the '784 patent, the parties would have referenced it in the Global Settlement Memorandum. Instead, the parties tracked the language, albeit in less detail, used in the January 1, 2001 Employment Agreement. At that time, Davidson had already used, in 2000, the PEC facilities to test and develop what he had conceived well before January 1, 2001.

The work that led to the Jumbo was performed prior to January 1, 2001. It is dubious that Davidson has raised this claim at this stage.

### 6.  There was no agreement with PEC in January 2003.

Davidson's contention that he made an agreement with PEC in January 2003 that he would be the owner of the Jumbo patent is specious. It conflicts with the claim he made in his July 8, 2003 Complaint in the Bankruptcy Court (Adv. Pro. No. 03-1340), where he stated, referencing the same February 3, 2003 Disclosure Statement upon which he relies here: "Such settlement agreement was at no point in time consummated." (Exhibit 15 at 10-11, ¶¶ 39-40.)

Davidson's reliance on the February 3, 2003 Disclosure Statement Relating to Plan of Reorganization Proposed by Pasteurized Eggs Corporation filed in the bankruptcy case is misleading and misplaced. Davidson did not advise the Court that the Disclosure Statement was amended and ultimately withdrawn on May 12, 2003. (Exhibit 16.) Davidson also failed to inform the Court that the first page after the cover page provides a "Disclaimer" indicating, "as

to contested matters, adversary proceedings and other actions or threatened actions, this Disclosure Statement shall not constitute or be construed as an admission of any fact or liability, stipulation or waiver, but rather as a statement made in settlement negotiations." (Exhibit 17.) The Disclaimer further provides "this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding…" (Id.) Despite this, Davidson utilizes the Disclosure Statement as evidence of an agreement. The document was nothing more than an offer of settlement with Davidson. The fact that PEC would be offering a settlement indicates that PEC believed it was the owner of the patent rights and it was trying to resolve a dispute with Davidson over the ownership.

 The other documents upon which Davidson relies are merely a collection of e-mails, memoranda, and other documents for discussion, and do not reflect a final agreement with terms adopted by all parties. There was no Board approval by PEC. There was no signed document from Davidson. It is unthinkable that PEC, in the throes of a bankruptcy proceeding, and having been through litigation with Davidson over the intention and meaning of signed documents, would enter into a verbal agreement with Davidson on an important asset.

 The documents Davidson asserts as reflecting an agreement do not even mention the Jumbo patent. Exhibit D, for example, references the '505 patent. While Davidson would like the documents to have actually mentioned the '784 patent, his unilateral attempt to rewrite them and change the actual language used should be rejected. It is important to note that the '505 patent was assigned by Davidson to PEC in the December 2000 Assignment. (See Exhibit 7.) Davidson disputed the validity of that Assignment, he continued to claim ownership of the '505 patent and NPE was forced to include that patent in this litigation, despite the fact that it was identified in the Bankruptcy Court Sale Order as an asset Davidson had no claim to (see Exhibit

13 at Schedule 1a). The '505 patent is the specific item mentioned in the April 28, 2002 (perhaps 2003) letter from James Rand to Attorneys Fred Whisenhunt and Joe McKinney Muncy in which he states "John has for some time indicated that he reserved the right to make a claim to the two 'Davidson' patents, assigned to PEC in December of 2000. He has further indicated that he considers the so-called Jumbo Application to be his property." (Defendant's Exhibit BB.)

None of Davidson's arguments address the status of PCT/US2002/05771 and the other foreign applications. The February 17, 2004 USPTO ruling addressed only the '784 patent. The Memorandum of Understanding between Davidson and Wagner addresses only the '784 patent. Because Wagner's claims were assigned to NPE and never deleted from the foreign counterparts, NPE must at minimum must be recognized as the owner of the foreign counterparts to the Jumbo. (See Exhibit 18.)

WHEREFORE, for the reasons set forth above and in its Motion for Summary Judgment, National Pasteurized Eggs, Inc. respectfully requests that this Honorable Court:

A.  Hold a hearing on NPE's Motion for Summary Judgment;

B.  Grant the Motion for Summary Judgment; and

C.  Grant such other relief as may be just and proper.

>
> Respectfully submitted,
>
> NATIONAL PASTEURIZED EGGS, LLC
>
> By its attorneys,
>
> PRETI FLAHERTY BELIVEAU & PACHIOS, PLLP

Dated: September 8, 2010        /s/ Peter G. Callaghan
                                Peter G. Callaghan, NH Bar #6811

P.O. Box 1318
Concord, NH 03302-1318
(603) 410-1500
pcallaghan@preti.com

D.W. TOONE & ASSOCIATES, PLLC

/s/ D. William Toone
D. William Toone
6727 185th Avenue NE
Redmond, WA 98052
(425) 250-4195
bill@dwtoonelaw.com

## CERTIFICATE OF SERVICE

    I hereby certify that on this 8th day of September 2010 a copy of the foregoing *Plaintiff's Reply to Defendant's Objection to Plaintiff's Motion for Summary Judgment as to APPs 16-20 (the "Jumbo")* was served on all counsel of record electronically via ECF.

/s/ Peter G. Callaghan
Peter G. Callaghan