# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

_____

| | | |
|---|---|---|
| National Pasteurized Eggs, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case Number: 1:07-CV-103-JL |
| | ) | |
| L. John Davidson, | ) | |
| | ) | |
| Defendant | ) | |

_____)

### DEFENDANT'S REPLY TO PLAINTIFFS OBJECTION

### TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, L. John Davidson ("Davidson"), through counsel, Paul C. Bordeau, PLLC, respectfully submits the within Defendant's Reply to Plaintiff's Objection to Defendant's Motion for Summary Judgment.

## I.    INTRODUCTION

In its Memorandum of Law in Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment ("NPE's Memo") (Doc. 102) at page 1, National Pasteurized Eggs, LLC ("NPE") begins with the assertion that Davidson "confuses patent ownership with patent inventorship."  There is no confusion.  A patent initially vests in

the inventor as personal property absent any assignments of record submitted to the United States Patent and Trademark Office ("USPTO") indicating otherwise.

Prior to the issuance of the Jumbo Patent (Exhibit A), PEC repeatedly petitioned the USPTO contesting the inventorship of the Jumbo Patent application.  Responding, the USPTO, in effect, made a determination prior to the issuance of the Jumbo Patent that ownership would initially vest in Davidson by finding and ruling that PEC had no standing to contest Davidson's rights to the inventiveness in the Jumbo Patent application.

NPE's Memo at page 2 (Doc. 102) next repeats its claim that the July 25, 2003 bankruptcy sale order (Exhibit B) actually conveyed the Jumbo Patent to it rather than maintaining the status quo of a dispute regarding ownership where the plain language of said order merely recognized NPE succession to whatever rights, if any, that PEC possessed in the Jumbo Patent application.

NPE's Memo at page 2 (Doc. 102) continues by claiming Davidson assigned ownership of the Jumbo Patent to PEC prior to the July 25, 2003 bankruptcy sale order. Again, the plain language of either of the two agreements between Davidson and PEC that could possibly have been operative at the time of the bankruptcy sale order reveal that Davidson would retain ownership of the combined inventiveness that comprises the Jumbo Patent while conditionally granting PEC certain licensing rights.  A review of both the September 20, 2001 Global Settlement Memorandum ("GSM")(Exhibit M) which supplant the January 2001 Employment Agreement and of the January 2003 agreement adopted by PEC containing the terms defined in the January 16, 2003 memorandum of Arthur Blasberg, Jr., Esq. (Exhibit L), which supplant the GSM support Davidson's

claim of ownership with PEC's conditional rights limited to licensing of the intellectual property at issue.

Upon the February 17, 2004 issuance of the Jumbo Patent to Davidson, he had the absolute ability to convey title and/or licensing rights to third parties.  Where the ownership of the Jumbo Patent application was being actively disputed throughout 2003, in the bankruptcy court prior to its sale order, in the USPTO both before and after the bankruptcy court sale order and in this court in the action commenced by Davidson against NPE in August 2003 and thereafter withdrawn upon the conclusion of PEC's unsuccessful petitions to the USPTO and the imminent issuance of the Jumbo Patent solely to Davidson which now contained only his claims of inventiveness. Upon the issuance of the Jumbo Patent in Davidson's and concomitant vesting of ownership in him, NPE knew or should have known that Davidson was interfering with NPE's claimed rights in the Jumbo Patent.  Nevertheless, NPE made no counterclaim of ownership to the Jumbo Patent application in the  August 27, 2003 action brought by Davidson.

Instead, inexplicably waiting more than three years from the issuance of the Jumbo Patent , NPE filed the instant action on April 7, 2007 after the expiration of the applicable statute of limitations.

The statute of limitations also impacts the defense of the equitable doctrine of laches pleaded by Davidson in his May 28, 2008 Defendant's Answer, Affirmative Defenses and Counterclaims to Plaintiff's Amended Complaint and Jury Demand ("Answer")(Doc. 31).   NPE's failure to commence this action creates a presumption that the delay is both unreasonable and prejudicial.

Page **3** of **25**

## II.    FACTS

At pages 2 and 8, respectively, NPE's Memo (Doc. 102) first alleges as fact and thereafter argues it owns the '784 (a/k/a the Jumbo Patent) based on the purported assignment of its ownership to PEC by both the January 2001 Employment Agreement and the September 20, 2001 GSM.  As accurately pointed out in NPE's Memo (Doc. 102) at page 8, "by the express terms of the GSM, the Employment Agreement was to be superseded, if the GSM was validly executed," and then, overlooking the Deposition of John Davidson transcript ("Deposition"), finishes the sentence with "which has not been established."

Scattered throughout page 253, line 13 through page 267, line  22 of the Deposition (Exhibit D), the discourse between Atty. William Toone and both Davidson and Rita Parent while sworn addresses the GSM's execution. While all three agree that neither party appears to currently have possession of a fully executed copy of the GSM, Rita Parent's testifies that a fully executed copy of the GSM (identifiable as a counterpart to the GSM presented as an exhibit by both parties in this action) was received by mail in June 2003 at PEC's Meredith, NH office during her last days as an employee and that she placed the signed GSM in Davidson's employment file but has no knowledge of what became of it thereafter as her employment with PEC terminated and PEC retained control of the employment files. Id. On page 256 of the Deposition, Davidson notes Armand Norehad's (PEC's Chairman) confirmation of the GSM's execution. Norhad's letter of November15, 2001 to shareholders (including Davidson), informed them of settlement of the the litigation (See Exhibit N at page 1, 1ˢᵗ ¶) by the "Global Settlement Memorandum

(the 'Memorandum') effective as of September 20, 2001, which sets forth the terms of the settlement" (See Exhibit N at page 1, 3rd ¶).  His letter continues, "The Memorandum was executed as of the effective date by all parties and states that it is binding.  The governance of the Company has, since the effective date, been conducted in accordance with the Memorandum." See Exhibit N at page 1, 3rd ¶.

Moving to Ms Parent's observations at Davidson's deposition, the accompanying September 22, 2010 Affidavit of Rita Parent ("Affidavit") is incorporated herein by reference rather than reciting all 6 pages of facts contained in the 24 paragraphs therein. In her Affidavit, Ms. Parent explains that she has "been employed as a personal assistant to L. John Davidson for more than eight years (¶2), that "[i]n 2004 L. John Davidson suffered two strokes" (¶3) and that, "[p]art[ly,] as the result of those two strokes was that he was left with very limited eyesight to the degree that he can neither read documents in which the font sizes normally used in everyday correspondence and commerce are employed." (¶3)  "Because of his reading limitations I am required to function as his eyes to read documents to him and have done so from the date of the filing of the above captioned matter." (¶3)

Noting that her typical "work day in Laconia consists of 8-9 hours of telephone conversation with Mr. Davidson which primarily includes the reading of and the dictation of documents" (¶4), Ms. Parent explains, "Together, Mr. Davidson and I have established a daily work routine in a carefully structured work environment which provides for limited disturbances and generally allows Mr. Davidson to successfully conduct his business affairs." (¶5)  In the next 11 paragraphs she explains the detail of the difficulties

and the accommodations to make their routine work.  Offering her observations from Davidson's two day deposition which she attended "and read documents or excerpts therefrom to him upon the direction of Atty. William Toone who conducted the deposition" (¶17) , she stated it was "vastly different than the process of document review and discussion that usually occurs on a daily basis between Mr. Davidson and myself. That environment which included prompt and clear memory under pressure of time to respond was beyond Mr. Davidson's current capabilities because both quick recall and association of facts with some dating back several years were beyond Mr. Davidson's current capabilities as experienced by me." (¶18)

Ms. Parent continues noting that, "[b]ased upon my already recited awareness of the changes that have occurred to Mr. Davidson's quick recall and association of facts for the years prior or recent and particularly under the pressure of speed for a response as created by the deposition I can attest to the fact that subsequent to his two strokes it is extremely difficult for him to associate facts under pressure of time and to do such particularly when he is out of his normal environment and is trying hard to be quick and accurate in his responses." (¶19)

Ms. Parent next related, "Although the process of Mr. Davidson being deposed was not out of the ordinary in the manner it was conducted and acknowledgment was made for Mr. Davidson's need to review and re-review certain excerpts from documents or even whole documents as required, Mr. Davidson in that environment was unable to engage in the extended review process he is accustomed to and lacked the usual aid in the association of facts and time sequences that I usually provide him and which he relies

upon through me.  That change of environment, lack of communication between me and him together with the desire to provide responsive answers promptly in combination ended up with confusion for Mr. Davidson on certain matters which otherwise would not have occurred." (¶20)

Not readily evident from a mere reading of the transcript, Ms. Parent observed, "Although Mr. Davidson appeared to answer the questions posed to the best of his ability during the deposition, it was clear to me that even when he appeared to understand the questions posed his answers displayed a lack of understanding of the contents and context of the documents.   In several instances on topics where he is otherwise familiar, if in an environment providing time to be properly directed on the topic at hand, the appearance during the deposition of either no memory or a faulty memory of facts would have been avoided.  My personal experience is that except for the environment of the deposition and in a more relaxed environment Mr. Davidson would have recalled more of the underlying facts to the questions he failed to respond to properly.  I know this personally because many of the questions contained facts that we together had reviewed recently." (¶21)

Looking forward to a trial setting, Ms. Parent expressed the belief that, "Based on my long term personal knowledge of Mr. Davidson through working with him daily, after observing his inability to answer responsively questions involving facts that would support him in his own defense in a routine deposition, I do not believe that he will be able to effectively function as a witness in defense of his own claims of ownership of the Jumbo Patent in a court environment." (¶22)

## III.    ARGUEMENT

### A. Statute of Limitations Bars NPE Claim

"It is elementary that inventorship and ownership are separate issues. ...[I]nventorship is a question of who actually invented the subject matter claimed in a patent. Ownership, however, is a question of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property. 35 U.S.C. § 261.

**At the heart of any ownership analysis lies the question of who first invented the subject matter at issue, because the patent right initially vests in the inventor who may then, barring any restrictions to the contrary, transfer that right to another, and so forth.**" Beech Aircraft Corp. v. EDO Corp., 990 F.2d 1237, 1248, 26 USPQ2d 1572, 1582 (Fed. Cir. 1993) (Emphasis added).

As a result, upon the issuance of the Jumbo Patent to Davidson, he had the absolute ability to convey title and/or licensing rights to third parties and had no need of a confirmatory order from another authority. With the time for challenging ownership of the Jumbo Patent in the USPTO at an end, NPE's sole source of possible relief was a court of competent jurisdiction.

NPE's Memo (Doc. 102)at pages 5-6 asserts,

"Davidson filed a complaint on July 8, 2003 in the Bankruptcy Court to assert his claim to ownership (while the proposed sale to NPE was pending), but voluntarily dismissed it without prejudice, over NPE's objection, on August 27, 2003.

Davidson re-filed his Complaint in this Court on that same day .... Because Davidson voluntarily dismissed the complaint on February 4, 2004, NPE did not have reason to defend its ownership of the '784 until 2007, when Davidson's noncooperation caused NPE to lose its Italian rights to the '784 IP, and jeopardized its other overseas patent prosecutions. NPE's ownership of the '784 had already vested, by virtue of the bankruptcy sale order and pre-bankruptcy assignment from Davidson to PEC."

Regardless of the status of NPE's rights in the Jumbo Patent IP, where Davidson asserted his claim of ownership to the Jumbo Patent IP in the bankruptcy court prior to the July 25, 2003 sale order, NPE was put on notice that whatever rights it thought PEC had and NPE would succeed to were contested. Evidencing an understanding that a grant of the Jumbo Patent solely to Davidson would jeopardize its and therefore its successor in

interest NPE's own rights to claim that ownership, PEC filed several petitions with the USPTO from July 7, 2003 through July 31, 2003 (See Exhibits G, H, I, J and K) to the USPTO claiming an interest in the inventorship and ownership of the Jumbo Patent application.  The USPTO dismissed PEC's claims in it's October 29, 2003 Decision (See Exhibit E) and November 18, 2003 Decision (See Exhibit F).

After the bankruptcy court's sale order preserving the status quo relative to the Jumbo Patent application, Davidson reasserted his claim of sole ownership in this Court on August 27, 2003.  In response to this claim of right by Davidson, NPE asserted no counterclaim in this Court to ownership of the '784 IP, neither joining the action nor indirectly through PEC which failed to file a counterclaim. Instead Davidson was allowed to voluntarily dismiss his own claim on February 4, 2003 when he anticipated the initial vesting of his claim of ownership to the Jumbo Patent which occurred 13 days later. Despite this initial vesting of title to the Jumbo Patent in Davidson on February 17, 2010, which can only be construed as a continuation by Davidson of a claim of ownership to the Jumbo Patent in derogation of NPE's alleged rights, NPE still failed to act and did not challenge Davidson's ownership until it filed the instant action on April 9, 2007, more than 3 years later.  As a result NPE is barred by New Hampshire RSA 508:4, I from enforcing whatever rights, if any, it may possess in the Jumbo Patent and its foreign counterparts.

Exclusive of NPE's ongoing but misplaced reliance on the July 25, 2003 bankruptcy court sale order as allegedly conveying ownership to the Jumbo Patent to it rather than merely conveying such rights as PEC held, if any, NPE also relies on the

January 2001 Employment Agreement and the Global Settlement Memorandum effective

September 21, 2001 alleging that as a matter of law the ownership of the Jumbo Patent

intellectual property was transferred to PEC upon the execution of the documents by

Davidson and PEC. Each of these claims will be debunked hereinafter by the simple

expedient of considering the plain meaning of the clear language of each document.

### B. Equitable Doctrine of Laches Bars NPE's Claim

Davidson pleaded the equitable doctrine of laches in his May 28, 2008 Answer (Doc. 31)

at page 5.  As explained in <u>Laukus v. Rio Brands, Inc.</u>, 09-3402, 09-3403 (FED6),

> "To benefit from the defense of laches, the party asserting it must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it. *Nartron*, 305 F.3d at 408. In this circuit, a plaintiff's delay in initiating a claim based upon trademark infringement is subject to a strong presumption of reasonableness as long as the analogous state statute of limitations has not elapsed. *Id.* However, when a plaintiff files suit outside that period, a rebuttable presumption arises that the delay was unreasonable and prejudicial to the defendant. *Id.*"

Where NPE brought its claims to the Jumbo Patent and its foreign counterparts

outside the statutory period, they are presumptively unreasonable and prejudicial.

<u>Laukus</u> further explains,

> "A party against whom laches is asserted based upon a delay beyond the statutory period may defeat the defense by "(1) rebu[ting] the presumption of prejudice; (2) establish[ing] that there was a good excuse for its delay; or (3) show[ing] that the defendant engaged in 'particularly egregious conduct which would change the equities significantly in plaintiff's favor.'" *Nartron*, 305 F.3d at 409 (quoting *Dana Corp.*, 647 F.Supp. at 583).

NPE's only excuse for delay alleges it did not need to act until "Davidson's non-

cooperation caused NPE to lose its Italian rights to use the '784 IP, and jeopardized its

other overseas patent prosecutions" (NPE Memo at page 6).  Apparently, NPE would

have the court believe upon vesting February 17, 2004, Davidson's ability to assign rights

to the Jumbo Patent to a bona fide purchaser for value would necessarily be inconsequential to their own claim of rights to it.

Even absent any proof of specific prejudice suffered by NPE's delay in contesting the ownership of the Jumbo Patent in Davidson since February 17, 2004, Serdarevic v. Advanced Medical Optics, Inc., 532 F.3d 1352, 1359 (Fed. Cir. 2008) counters any argument "that a defendant cannot rely on the presumption alone, but must present affirmative evidence of prejudice. This is wrong as a matter of law. Once the presumption of laches has attached, 'the defendants could have remained *utterly mute* on the issue of prejudice and nonetheless prevailed,'" (quoting *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1554 (Fed.Cir.1996)).

> "'Material prejudice ... may be either economic or evidentiary. Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts.... Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit.'"

Serdarevic at 1360 (quoting *Aukerman,* 960 F.2d at 1033 (citations omitted)).

At a minimum, NPE's delay has certainly reduced the useful economic lifetime of patent protection afforded Davidson's intellectual property.

While Davidson bears no burden of proof to demonstrate evidentiary prejudice to support the presumption of laches, Rita Parent's observations from the two day deposition of the 78 year old Davidson beginning August 24, 2010 provide an indisputable preview of what a trial proceeding would likely entail illustrating the degree of his inherent inability to conduct a full and fair defense of his claim to the Jumbo Patent during the grueling examination regimen and stress typical in a trial.

While, NPE might argue that otherwise regarding Mr. Davidson's capabilities based on their limited experience and contact with him, there can be no doubt that due to her unique role "employed as a personal assistant to L. John Davidson for more than eight years (Affidavit ¶2), including the entire period since "2004 [when] L. John Davidson suffered two strokes" (Affidavit ¶3) and that, "[p]art[ly,] as the result of those two strokes was that he was left with very limited eyesight" (Affidavit ¶3) such that she is "required to function as his eyes to read documents to him and ha[s] done so from the date of the filing of th[is] matter." (Affidavit ¶3)

Her typical "work day in Laconia consists of 8-9 hours of telephone conversation with Mr. Davidson which primarily includes the reading of and the dictation of documents." (Affidavit ¶4)  Ms. Parent explains, "Together, Mr. Davidson and I have established a daily work routine in a carefully structured work environment which provides for limited disturbances and generally allows Mr. Davidson to successfully conduct his business affairs." (Affidavit ¶5)  In the next 11 paragraphs she explains the particular detail of the difficulties and the accommodations to make their routine work.

At Davidson's deposition she "read documents or excerpts therefrom to him upon the direction of [NPE's]Atty. William Toone ...." (Affidavit ¶17)  She observes, it was "vastly different than the process of document review and discussion that usually occurs on a daily basis between Mr. Davidson and myself.   That environment which included prompt and clear memory under pressure of time to respond was beyond Mr. Davidson's current capabilities because both quick recall and association of facts with some dating back several years were beyond Mr. Davidson's current capabilities as experienced by

me." (Affidavit ¶18)  She continues noting that, "[b]ased upon my already recited awareness of the changes that have occurred to Mr. Davidson's quick recall and association of facts for the years prior or recent and particularly under the pressure of speed for a response as created by the deposition I can attest to the fact that subsequent to his two strokes it is extremely difficult for him to associate facts under pressure of time and to do such particularly when he is out of his normal environment and is trying hard to be quick and accurate in his responses." (Affidavit ¶19) She adds, "Although the process of Mr. Davidson being deposed was not out of the ordinary in the manner it was conducted and acknowledgment was made for Mr. Davidson's need to review and re-review certain excerpts from documents or even whole documents as required, Mr. Davidson in that environment was unable to engage in the extended review process he is accustomed to and lacked the usual aid in the association of facts and time sequences that I usually provide him and which he relies upon through me.  That change of environment, lack of communication between me and him together with the desire to provide responsive answers promptly in combination ended up with confusion for Mr. Davidson on certain matters which otherwise would not have occurred." (Affidavit ¶20)

Readily evident to her, Ms. Parent noted, "Although Mr. Davidson appeared to answer the questions posed to the best of his ability during the deposition, it was clear to me that even when he appeared to understand the questions posed his answers displayed a lack of understanding of the contents and context of the documents.   In several instances on topics where he is otherwise familiar, if in an environment providing time to be properly directed on the topic at hand, the appearance during the deposition of either no

memory or a faulty memory of facts would have been avoided.  My personal experience is that except for the environment of the deposition and in a more relaxed environment Mr. Davidson would have recalled more of the underlying facts to the questions he failed to respond to properly.  I know this personally because many of the questions contained facts that we together had reviewed recently." (Affidavit ¶21)

Looking forward to a trial setting, Ms. Parent expressed the belief that, "Based on my long term personal knowledge of Mr. Davidson through working with him daily, after observing his inability to answer responsively questions involving facts that would support him in his own defense in a routine deposition, I do not believe that he will be able to effectively function as a witness in defense of his own claims of ownership of the Jumbo Patent in a court environment." (¶22)

Evidentiary prejudice is indisputably apparent in Davidson's performance.

### C. Global Settlement Memorandum Replaces Employment Agreement

NPE agrees "by the express terms of the GSM, the Employment Agreement was to be superseded, if the GSM was validly executed," (NPE Memo at page 8) but "which has not been established " NPE then claims.

Within the range of page 253, line 13 through page 267, line  22 of the Deposition (Exhibit D), the discourse between Atty. William Toone and both Davidson and Rita Parent while sworn addresses the GSM (Exhibit M). While all three agree that neither party appears to currently have possession of a fully executed copy of the GSM,  Rita Parent's testifies that a fully executed copy of the GSM (identifiable as a counterpart to the GSM presented as an exhibit by both parties in this action) was received by mail in

June 2003 at PEC's Meredith, NH office during her last days as an employee and that she

placed the signed GSM in Davidson's employment file but has no knowledge of what

became of it thereafter as her employment with PEC terminated and PEC retained control

of the employment files. Cut off before she can complete her response, Rita Parent tries

to explain that the only existing copy of the GSM bears word-processing version data at

the bottom of each identifying it as "LJD-PEC Head of Agreement 09-20-01 (execution

copy5) fax.doc." Deposition (Exhibit D) at pages 257-258.

Generally referenced on page 256 of the Deposition (Exhibit D) by Davidson is

Armand Norehad, PEC's  Chairman, who confirmed notice of the GSM's execution by

letter of November15, 2001 to shareholders (including Davidson), informing them of

settlement of the the litigation (See Exhibit N at page 1, 1st ¶) by the "Global Settlement

Memorandum (the 'Memorandum') effective as of September 20, 2001, which sets forth

the terms of the settlement" (See Exhibit N at page 1, 3rd ¶).  His letter continues,  "The

Memorandum was executed as of the effective date by all parties and states that it is

binding.  The governance of the Company has, since the effective date, been conducted in

accordance with the Memorandum." See Exhibit N at page 1, 3rd ¶.

Moving to the terms of the GSM, NPE claims the '726 (Exhibit C) is "Old

Inventiveness" which per §1.c., of the GSM (Exhibit M at page 2) then provides,

"**New processes or intellectual property ("Inventiveness")** developed prior to January
1, 2001 ("Old Inventiveness"), including a method for extending the shelf life of
pasteurized eggs by treatment with antibacterial agents, shall be the property of PEC"
(emphasis added).

NPE steadfastly claims the Jumbo Patent comprises merely "Old Inventiveness"

developed prior to January 1, 2001 and filed in the '726 on February 28, 2001 which with

the same processes and intellectual property improved merely by some further tinkering with no new processes or intellectual property created by Davidson in 2001.

Assume arguendo that the '726 is "Old Inventiveness" and that the GSM unconditionally assigns "Old Inventiveness" as a matter of law to PEC.

Similarly, as a matter of law the GSM unconditionally assigns "New Inventiveness" to Davidson at §1(d) (Exhibit M at pages 2-3), providing,

> "Inventiveness developed by LJD, whether in combination with 'Old Inventiveness' or prior inventiveness, which results in protection from new patents or patent applications providing broader or improved protection, on or subsequent to January 1, 2001 ('New Inventiveness') shall be considered the property of LJD    ...."

From the plain language §1(d), it is evident that to the extent that the GSM controls the outcome, the ownership of the Jumbo Patent by Davidson depends only upon whether it contains "**new processes or intellectual property**" (emphasis added) (See "Inventiveness" as defined at GSM §1(c)), "whether in combination with 'Old Inventiveness' or prior inventiveness, which results in protection from new patents or patent applications providing broader or improved protection, on or subsequent to January 1, 2001." (Exhibit M at page 2).

A brief highlighting of previously detailed demonstrations of the Jumbo Patent's "New Inventiveness" developed subsequent to the filing of the '726 will be made later in this pleading at section *F* on page 14.  Besides head to head comparisons of the inventiveness in the Jumbo Patent and the '726, there is also correspondence alluding to ongoing discovery and development of intellectual property that would become part of the Jumbo Patent, all of which is enumerated in Davidson's Memorandum of Law in

Support of Defendant's Objection to Plaintiff's Motion for Summary Judgment (Doc. 72 at pages 4-8, 18-19).

For any "New Inventiveness" owned by Davidson by the grant of §1.d., of the GSM, §1(d)(i) provides PEC must respond with a writing to accept the licensing rights that, "LJD shall be obliged to offer PEC the New Inventiveness for exclusive license subject to the performance by PEC of the obligations set forth 1(d) (ii) and (iii) below ..." which provide for royalty payments to Davidson and PEC's obligation to pay for the cost of the prosecution of the New Inventiveness. (Exhibit M at page 2)

As "New Inventiveness" ownership of the Jumbo Patent would remain with Davidson and, at best, PEC would be conditionally entitled to exclusive licensing rights upon the performance of the conditions both precedent and subsequent in the GSM.

### D. Agreement of PEC with Davidson Based on January 16, 2003 Memorandum

Even if the GSM conveys any rights to PEC, whether of ownership of "Old Inventiveness" or licensing of "New Inventiveness," the agreement between PEC and Davidson in January 2003 based on the detailed terms enunciated in memorandum of January 16, 2003 by Arthur Blasberg, Jr. ("Blasberg Memo") (See Exhibit L) unequivocally declares the Jumbo Patent application's  intellectual property is owned by Davidson while also agreeing that PEC has conditionally has exclusive licensing rights.

Despite mislabeling the Jumbo Application as the already issued December 1, 1998, US 5,843,505 patent, the Blasberg Memo, (See Exhibit L at pages 1-2)  provided,

"Paragraph 1. The IP is the so-called 'jumbo' patent application, US 5,843,505 [(intending US 10/084,444)], PCT/US 02-05771 (the European filing of the US patent application) and any improvements and new inventions conceived of at any time by Davidson relating thereto (Agreed IP). It is understood that the patent application(s)

may be split up by Davidson or a patent examiner whereby those claims will be treated as separate patent applications.

Mike Wagner is credited with inventing certain claims and those claims will be separated  from the jumbo patent application as separate patent applications.

Paragraph 2. Davidson is the owner of US 5,843,505 [(intending Jumbo Application US 10/084,444)] and PCT/US 02-05771,with the exception of those claims credited to Wagner.

Paragraph 3. PEC will support Davidson in his engaging BSKB and Fred Whisenhunt or any other patent counsel that Davidson may wish to employ and will communicate with BSKB and Whisenhunt in writing in such form as may be requested by Davidson. PEC reserves the right to require BSKB and Whisenhunt to step aside in the event a dispute arises as to the ownership of IP other than the Agreed IP.

Paragraph 4. PEC will have an exclusive 'Right of First Refusal' for a global and perpetual exclusive license on the Agreed IP so long as (a) royalty payments are made in a timely manner and (b) the Plan of Reorganization for PEC provides for the payment of money..." which is then enumerated thereinafter."

By irrevocable operation of law, the January 2003 agreement based on the plain

language of the Blasberg Memo indisputably granted Davidson ownership of (1) the

Jumbo Patent once Myron Wagner's limited claims of inventiveness, (2) its foreign

counterparts, "and [(3)] any improvements and new inventions conceived of at any time

by Davidson relating thereto (Agreed IP)." (See Exhibit L at page 1)

Reference is made to Davidson's Memorandum of Law in Support of Defendant's

Objection to Plaintiff's Motion for Summary Judgment (Doc. 72 at pages 20-25) for a

more detailed analysis.

### E. Bankruptcy Court Preserves Status Quo of Jumbo Patent Ownership

Upon PEC's motion, the US Bankruptcy Court for District of NH issued its July

25, 2003 Order ("Sale Order") which provided (See Exhibit B at page 3, ¶ 6),

"Debtor is authorized to convey to NPE all legal and equitable rights the Debtor has to claim ownership in the assets listed on Schedule 1.24B-1, subject only to the competing ownership claims of Davidson."

The Order concludes (See Exhibit B at page 6 and page 8, respectively),

"F. The conveyance of the Assets under the APA shall be approved subject to the following modifications and legal requirements: ...

v. In approving the sale of the Assets described on Schedule 1.24B-1, **the entry of this Order shall not**, **with respect to** such Assets including but not limited to **U.S. Published Patent Application No. 10/084,444** (the "444 Application") **impair any rights and claims held by Davidson or NPE** (by assignment from the Debtor and Myron A. Wagner) **against any party relating to the prosecution and/or ownership of such Assets as submitted to the USPTO and any patents that may issue hereafter with respect thereto**" (emphasis added)."

Absent ambiguity, the plain language of the Order may be interpreted as a matter of law by this Court.  On its face, the Order simply preserves the then existing respective claims of the parties without making any determination as to the character or quality of those claims.  While the Order clearly allows that the parties claims may be derived from assignment, an assignee can take no greater rights that the assignor has to assign.   As a result this Court must grant partial summary judgment to the extent that the Order does not grant ownership of the Jumbo Patent or its foreign counterparts still at issue to NPE or Davidson but merely preserves such claims as the parties may otherwise possess.

### F. The "New Inventiveness"of the Jumbo Patent

For the purpose of the consideration of whether the Jumbo Patent constitutes "New Inventiveness," one must not lose sight of the definition of "Inventiveness" which

is defined broadly in the GSM, at §1(c) as "**[n]ew processes or intellectual property**" (emphasis added).  (Exhibit M at page 2)

    While a complete reading and comparison of the Jumbo Patent (Exhibit A) and the '726(Exhibit C) provides the most detailed and vivid evidence of the of the "New Inventiveness" of the Jumbo Patent, and while the excerpted detail previously presented in Davidson's Memorandum of Law in Support of Defendant's Objection to Plaintiff's Motion for Summary Judgment (Doc. 72) definitively demonstrates the "New Inventiveness" of the Jumbo Patent, reduced to the fewest words at the most general level, the basic elements that are transparently recognizable as the new processes and intellectual property qualifying the Jumbo Patent as "New Inventiveness" include, but are not necessarily limited to, the following:

    1.  Most fundamentally, unknown to and undeveloped by Davidson at the time of filing the '726, the newly discovered inherent property of eggs identified as functionality "plateaus," lead to a new understanding and process with the ability to maximize the application of higher processing temperatures at the most opportune times in the log reduction  process while minimizing the loss of functionality of the eggs.  Upon this foundation of understanding, all of the other incidents of the pasteurization process employed by the Jumbo Patent are designed and developed to achieve the optimal pasteurization consistent with the inherent in the physical property of functionality manifested by shell eggs when heat is applied over time. <u>See</u> Doc. 72 at pages 6 and 18-19;

2.  While the Jumbo Patent and the '726 both feature multi-temperature pasteurization in one continuous water bath with discrete 3 heating zones, the zone temperatures are significantly different and range of up to 11° F, 3° F and 5° F, respectively as part of a new process.  See Doc. 72 at pages 5 and 18;

3  While both the Jumbo Patent and the '726 remove the shell eggs from the pasteurization bath at elevated temperatures prior to the desired 5 log reduction in Salmonella which is attained during the continued pasteurization that occurs until they cool to 128° F., in the ambient air, as part of the new process the Jumbo Patent can remove the eggs at a lower log reduction but higher temperature and still reach the desired reduction of Salmonella faster by a difference ranging from 1 - 2.5 minutes further increasing economic productivity; See Doc. 72 at pages 5 and 18;

4.  With another new process unknown to and undeveloped by Davidson at the time of filing the '726, the Jumbo Patent employs a revolutionary heating  zone temperature homogenization and zone isolation technique based on "jet fluid" and "jet fluid walls" whereby the uniformity of water temperature is maintained upwards a greater vertical distance from the bottom of the tank to the top and reduces the mixing of different temperature water between horizontally located pasteurization zones which besides increasing the uniformity of the pasteurization process at any location within a heating zone also allows a larger volume zone enabling egg flats to be stacked 5 high instead 4 as with the '726 thereby further increasing economic productivity by 25% by this means alone.

See Doc. 72 at pages 6-7 and 19;

5.  While the '726 continuously moves shell eggs through 3 heating zones of more or less equal length for a more or less equal time, the Jumbo Patent tunes the length of its 3 zones in concert with zone temperatures and optimal plateau times to minimize the bath dwell time of the eggs by devising an optimal zone length. See Doc. 72 at pages 7 and 19;

6.  Both the '726 and the Jumbo Patent  incorporate application of an anti-bacterial fluid and then a wax based sealant to the shell of the egg promptly upon its removal  from the heated bath to deter bacterial rotting which shortens the shelf life to less than that of a raw egg.

If these new processes or inherent understanding were conceived of, much less existing even in some rudimentary from as of the February 28, 2001 filing of the '726, Davidson surely would have included them to ensure their protection against some other third party discovering, developing and provisionally protecting the processes and intellectual property before he did.  The only reasonable inference is that their absence in the '726 reflects their absence of their existence at that time.

Although combined with inventiveness in the '726  such as the antibacterial spray and while still using a variant of a heated water bath to pasteurize eggs, at its core, it is the careful calibration and combination of all of the above recited elements which create a revolutionary new pasteurization process whereby the pasteurization bath dwell time reduced to 39-41 minutes by the Jumbo Patent reflecting a 22%-26% improvement over the 52 minute 40 seconds of the '726 as tested and by 11%-14% over the '726 as designed

while, exclusive of the time related productivity gains, also increased the processing

batch volume by 25%.  (See Doc. 72 at pages 4 and 18) When the out of the water time to

complete pasteurization to 5 logs during cooling of 1.5 -3 minutes for the Jumbo Patent

process as compared to 4 minutes for the '726 process (See Doc. 72 at pages 5 and 18) is

figured in the total time for pasteurization to 5 logs is 40.5 -44 minutes for the Jumbo

Patent process and 56 minutes 40 seconds as tested and 50 minutes as designed for the

'726. Exclusive of batch volume increases in productivity, the Jumbo Patent reduces

processing time 22.5% - 28.5% for the '726 as tested and 12% - 19% for the '726

designed.

 The minimum designed processing time for the '726 reflects the limits of what can

be accomplished by the "inventiveness" comprised the '726.  One easy measure of that

limit is the prediction of a minimum processing time to a 5 log Salmonella reduction of a

46 minute water bath dwell time followed by a 4 minute air cooling for a total of 50

minutes.  Without the new processes built around and used in conjunction with the

understanding and knowledge of the "functionality plateaus," as optimized in the Jumbo

Patent the water bath dwell of 39-41 minutes and continuing pasteurization times of only

1.5-3 to the 5 log standard never would have been achieved by the '726 no matter how

much its processes were refined.  The unavoidable conclusion as proven by dramatic

reductions of the Jumbo Patents processing times is that it could only have resulted from

new processes and intellectual property discovered and developed after the filing of the

'726 or surely, at the very least the untested design time predicted in the '726 surely

would not have been so dramatically eclipsed by the Jumbo Patent.

Where, absent ambiguity, the interpretation of various agreements and other writings is a matter of law for the court to determine, then despite the well intended but often unhelpful and confused testimony of Davidson offered by NPE to create the illusion of factual disputes as to the intent of various writings where there are no disputes, then in conclusion where,

1. NPE is barred by the statute of limitations from enforcing a claim of ownership to the Jumbo Patent and its foreign counterparts;

2. NPE is barred by the equitable doctrine of laches from enforcing a claim of ownership to the Jumbo Patent and its foreign counterparts;

3. The Jumbo Patent qualifies as "New Inventiveness" per §1(d) of the GSM where it is comprised of some new processes and/or new intellectual property developed on or after January 1, 2001 even if used in conjunction with "Old Inventiveness" as defined in §1(c) of the GSM;

4. As a matter of law, upon the execution of the GSM, §1(d) grants Davidson ownership of patents with "New Inventiveness" that result in improved and broader protection of the integrated shell egg pasteurization and extension of shelf life process with its combination of "Old Inventiveness" and new processes and/or intellectual property developed after January 1, 2001;

5. The GSM supersedes the Employment Agreement and ;

6. As a matter of law, the agreement reflected by the January16, 2003 Blasberg Memo grants Davidson ownership of the Jumbo Patent and its foreign counterparts; and

7.  The July 25, 2003 Order of the bankruptcy court merely preserves such rights to the Jumbo Patent as each party possesses as of said date;

8.  Absent ambiguity, the court may interpret the GSM, the Blasberg Memorandum and the July 25, 2003 Order as a matter of law;

then Davidson's motion for summary judgment should be granted.

Date: September 22, 2010

By:____/s/ Paul C. Bordeau____
Paul C. Bordeau
NH Bar #8128
25 Country Club Road
Suite 502
Gilford, NH 03249
(603) 524-0207
bordeau@metrocast.net

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this pleading was served on the following persons on this date in the manner specified herein:

Electronically served through ECF: Peter G. Callahan, Esq., and D. William Toone, Esq.;

Conventionally served: L. John Davidson.

 /s/ Paul C. Bordeau_____
Paul C. Bordeau