# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

National Pasteurized Eggs, LLC,    )
    )
        Plaintiff    )
    )
        v.    )    Case Number: 1:07-CV-103-JL
    )
L. John Davidson,    )
    )
        Defendant    )
    )

## AMENDED DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT AND JURY DEMAND

Defendant, L. John Davidson ("Davidson"), through his counsel, Paul C. Bordeau, PLLC, hereby answers the Amended Complaint of Plaintiff as follows:

### GENERAL DENIAL

Each numbered paragraph in this Answer responds to the identically numbered paragraph in Plaintiff's Amended Complaint. Defendant denies all allegations, declarations, claims or assertions in the Amended Complaint that are not specifically admitted in this Answer.

### NATURE OF THE ACTION

1. The allegations of Paragraph 1 of the Amended Complaint are admitted.

### THE PARTIES

2. The allegations of the first sentence to Paragraph 2 of the Amended Complaint are admitted; the remaining allegations of Paragraph 2 are denied.

3. The Defendant admits he is a citizen of the State of New Hampshire; Defendant denies he is a resident of Laconia, New Hampshire.

1

4. Defendant admits that this action purports to arise under the Declaratory Judgment Act, but denies that said Act confers subject matter jurisdiction on this Court. Defendant further admits that there is diversity of citizenship but denies that the amount in controversy is $75,000.00. Defendant further denies subject matter jurisdiction in that Federal Courts lack subject matter jurisdiction over foreign patents and foreign patent applications.

5. The allegations of Paragraph 5 of the Amended Complaint state a conclusion of law which Defendant is not required to admit or deny.

6. The allegations of Paragraph 6 of the Amended Complaint are denied.

7. The allegations of Paragraph 7 of the Amended Complaint are admitted.

8. The allegations of Paragraph 8 of the Amended Complaint represent an accurate quote from the referenced document and Defendant, therefore, admits the accuracy of the quotation, however, Defendant denies that the Agreement is binding on him.

9. Defendant admits that the patent applications referenced in the allegations of Paragraph 9 of the Amended Complaint are accurate, but denies that the applications constitute intellectual property transferred to NPE.

10. The allegations of Paragraph 10 of the Amended Complaint are denied.

11. The allegations of Paragraph 11 of the Amended Complaint are denied to the extent it alleges that Defendant filed the application. In fact, App 15 was filed by PEC's lawyers, Kenyon & Kenyon, using a signature page with Defendant's signature from a much earlier patent application. Defendant had no knowledge of App 15 at the time it was filed.

12. The application specified in the allegations of Paragraph 12 of the Amended Complaint speaks for itself. The remaining allegations of Paragraph 12 are denied.

2

13. The allegations of Paragraph 13 of the Amended Complaint are denied as written.

14. The allegations of Paragraph 14 of the Amended Complaint are admitted.

15. The allegations of Paragraph 15 of the Amended Complaint are admitted, with the exception of Plaintiff's characterization of the applications as "Extension IP."

16. The allegations of Paragraph 16 of the Amended Complaint represent Plaintiff's conclusions regarding language of the patent application specified in the paragraph and Defendant, therefore, denies the same.

17. The allegations of Paragraph 17 of the Amended Complaint are denied.

18. The allegations of Paragraph 18 of the Amended Complaint are denied.

19. The allegations of Paragraph 19 of the Amended Complaint are admitted to the extent that the '505 and '538 patents were referenced in the assignment, the remaining allegations of the paragraph are denied.

20. The allegations of Paragraph 20 of the Amended Complaint is a quotation from a document and Defendant admits the accuracy of the quotation. .

21. The allegations of Paragraph 21 of the Amended Complaint are denied.

22. The allegations of Paragraph 22 of the Amended Complaint are denied.

23. The allegations of Paragraph 23 of the Amended Complaint are denied.

24. The allegations of Paragraph 24 of the Amended Complaint are denied.

25. The allegations of Paragraph 25 of the Amended Complaint are denied.

26. The allegations of Paragraph 26 of the Amended Complaint are denied.

27. The allegations of Paragraph 27 of the Amended Complaint  are denied.

28. The allegations of Paragraph 28 of the Amended Complaint are denied and by way of

further answering, Defendant states that in light of the Court's most recent ruling any allegation of ownership based on the Bankruptcy Court order is made in bad faith.

29. The allegations of Paragraph 29 of the Amended Complaint are denied.

30. The allegations of Paragraph 30 of the Amended Complaint are denied.

31. The allegations of Paragraph 31 of the Amended Complaint are denied.

32. The allegations of Paragraph 32 of the Amended Complaint do not require a response from Defendant.

## COUNT I

### DECLARATORY JUDGMENT OF RIGHTFUL OWNERSHIP THROUGH THE BANKRUPTCY COURT ORDER

33. Defendant admits that Plaintiff is now claiming ownership to the patents and patent applications, however, Defendant denies that the ownership claims of Plaintiff present a case or controversy for adjudication in this Court.

34. The allegations of Paragraph 34 of the Amended Complaint are denied in that this Court has no jurisdiction to hear the matter.

35. The allegations of Paragraph 35 of the Amended Complaint are denied.

36. The factual allegations of Paragraph 36 of the Amended Complaint are denied.

37. The allegations of Paragraph 37 of the Amended Complaint are denied.

38. The factual allegations of Paragraph 38 of the Amended Complaint are denied.

## COUNT II

### DECLARATORY JUDGMENT OF LACHES

39. The allegations of Paragraph 39 of the Amended Complaint do not require a response from Defendant.

4

40. The allegations of Paragraph 40 of the Amended Complaint are denied. Defendant is the inventor and record owner of all the applications and patents that are the subject matter of this action and he is not required to take any affirmative action to secure his ownership rights.

## COUNT III

## DECLARATORY JUDGMENT OF ESTOPPEL

41. The allegations of Paragraph 41 of the Amended Complaint do not require a response from Defendant.

42. The allegations of Paragraph 42 of the Amended Complaint are denied.

## COUNT IV

## DECLARATORY JUDGMENT OF ABANDONMENT

43. The allegations of Paragraph 43 of the Amended Complaint do not require a response from Defendant.

44. The allegations of Paragraph 44 of the Amended Complaint are denied.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part due to a failure of consideration.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by estoppel.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs claims are barred by the doctrine of laches.

5

## FIFTH AFFIRMATIVE DEFENSE

This court lacks subject matter jurisdiction to decide ownership interests in the intellectual property.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the statute of limitations, NHRSA 508:4, I 3.

## ADDITIONAL AFFIRMATIVE DEFENSES

Defendant reserves the right to amend his Answer and plead additional or more specific defenses as warranted by the facts determined through the conclusion of the discovery process.

## PRAYER FOR RELIEF

Defendant respectfully requests that this court:

A. *Dismiss Plaintiff's Amended Complaint in its entirety with prejudice; and*

B.  Grant such other and further relief as the Court deems just and proper.

## DEFENDANT'S COUNTERCLAIM

## FACTUAL BACKGROUND

A. Market Background and Davidson's Efforts to Develop the Product and Build the Company

1.  Davidson, a New Hampshire based inventor and entrepreneur, has devoted most of the past fourteen years to developing a process that eliminates the risk of egg-related illness.  The process involves pasteurization of an egg in its shell without cooking the egg or otherwise compromising the tste and aesthetics that consumers demand.

2.   In 1991, Davidson, with his own funds, purchased the then -nascent laboratory level technology and began its further development. By 1993, Davidson's accomplishments had reached a point warranting further outside investment, including product development and improvement, the establishment of FDA standards of the process, and commercialization at low-added cost to the consumer.

6

3. By year end 1997, Davidson had completed the design and construction of a commercial scale pasteurization machine which would pasteurize eggs to FDA requirements established at Davidson's request.

4. Davidson formed Pasteurized Eggs, LP, a Limited Partnership, to facilitate raising of capital and further commercialization of the proprietary process.

5. A corporation, the Davidson Group Shell Egg Corporation, was also formed. This corporation was the general partner of the limited partnership.

6. From 1993 to 2000, Davidson served as President, Chief Executive Officer, and Chairman of the Board of Directors of Davidson Group Shell Egg Corporation.

7. During the nine year period between 1991 and 2000, Davidson worked diligently to create new technology and to protect the intellectual property by filing numerous applications for patent protection.

8. During his tenure as Chief Executive Officer, Davidson made remarkable progress on a number of critical fronts, including but not limited to the following:

    a.       He raised approximately $12 million in financing. Investors received a percentage share of ownership interest, and significant investors, scientists and food executives were given seats on the Board of Directors;

    b.       He acquired the technology and refined it at the laboratory levels and filed and obtained meaningful patent protection;

    c.       He successfully lobbied the U.S. Food and Drug Administration ("FDA") to set a standard for pasteurization. He also persuaded the U.S. Department of Agriculture ("USDA") to create a new shield for pasteurized eggs. Good Housekeeping granted its Seal of Approval to this pasteurization process for in-shell eggs;

    d.       He created and delivered the first commercial scale production equipment to mass produce the product and to provide a low cost safe product to the consumer; and,

7

    e.       He contracted a license composed of two major egg producers and, under his personal supervision, set up the licensee's plant, including equipment containing his technology, and delivered to the licensee customers orders from some 700 initial supermarkets.

9. Through further refinement of the technology, Davidson successfully achieved pasteurization in the laboratory without negatively affecting egg functionality and aesthetics. In other words, Davidson's technology killed the bacterial without cooking the egg. Eventually, he created a machine to mass produce the product with consistency.

10. In May 2000, the product went to selected markets through the limited partnership's first licensee, located in South Carolina. Davidson provided hands-on management to the licensee.

11. By August 2000, Davidson had achieved significant market penetration for his new product.

12. During this period, Davidson also took careful steps to protect the intellectual property by filing for patent protection. Numerous patents were filed and have since issued under Davidson as the named inventor.

13. In early 2000, the company entered into the retail marketplace under Davidson's stewardship.

14. Certain members of the Board of Directors insisted that Davidson enter the market in May 2000 over Davidson's objections because the machinery, product quality and shelf life had not been tested adequately for the product to be ready for public consumption. Further, those same Board members insisted that the test market created by Davidson be expanded significantly before having knowledge and experience customary from an initial test market entrance.

8

15. As a result of the reckless entrance, enormous market costs ensued, product recalls occurred, the significant successful public relations campaign achieved for the product entrance into the marketplace dried up and was squandered, the company ran out of capital, missed its opportunity, lost marketing momentum and ultimately never recovered.

16. By year end 2000, the enterprise had run up significant debt and required further capital to correct its marketing errors, to enhance its marketing efforts, penetration and to continue its operation.

**B.      January 2001: PEC is Formed and PEC Board Members Begin Their Plan to Oust Davidson, Gain Company Control and Illegally Take Title to Davidson Intellectual Property.**

17. In mid year 2000, Rand, a principal of Atlantic Capital Partners, LLC acting as broker, introduced John Beinecke ("Beinecke"), a principal of Antaeus, to Davidson shortly after Atlantic Capital Partners, LLC had committed to invest some $2.0 million.

18. After due diligence, Antaeus invested some $2.0 million.

19. As part of the investment transaction, effective on January 1, 2001, the limited partnership and the general partner corporation were merged into a new corporation, called Pasteurized Eggs Corporation ("PEC"). PEC was organized under Delaware law, with its principal place of business in Laconia, New Hampshire. The Board of the new entity consisted of Davidson, along with Rand, Beinecke and certain others. Brody became a director approximately by the fall of 2001.

20. PEC acquired the Pasteurized Eggs, LP and the assets of its General Partner, The Davidson Group Shell Egg Corporation. Moreover, Davidson provided PEC with specific and limited assignments to certain intellectual property in reliance, inter alia, on promises confirmed by unanimous vote by the board regarding the terms of an employment agreement

9

("Employment Agreement") with Davidson and the commitment of infusion of new capital to be provided by Atlantic Capital Partners, LLC and Antaeus Enterprises, Inc.

21. After January 20, 2001 (the date the Employment Agreement was executed), Rand, together with other members of the Board of Directors, gained control of PEC.

22. Further, upon information and belief, Rand, and other PEC Board members were actually engaged in a scheme to convert Davidson's intellectual property assets to their own benefit, to deprive Davidson of significant amounts of money to which he was owed, and to enter into a series of agreements with Davidson which they had no intent of honoring and which, in fact, were not honored.

23. This scheme continued up to and including the time when PEC was forced to file for bankruptcy protection in October 2002, as well as when PEC sought to sell its assets in bankruptcy to National Pasteurized Egg Corporation ("NPE").

24. The Employment Agreement provided that Davidson was to receive a base salary of $210,000 per year, with annual adjustments thereafter, in consideration of his work on behalf of PEC. The Employment Agreement further provided that Davidson was eligible for annual bonuses and other benefits.

25. The Employment Agreement also provided that "upon [PEC's] request and at its expense," Davidson shall execute all documents "reasonably necessary to assign his right, title and interest" in inventions conceived, developed or reduced to practice prior to January 1, 2001. Inventions conceived, developed or reduced to practice on or after January 1, 2001, will be "owned by [Davidson] and [his] successors for the life of the Invention."

10

26. Since Davidson intended to continue to license the intellectual property to PEC on a royalty basis, and because he was the largest single shareholder and PEC owed him approximately $500,000, Davidson chose to stay with PEC and executed the Employment Agreement thus reconfirming the assignments of certain specific US patents by Davidson to PEC, and reconfirming Davidson's continued role in that company, his ownership of new inventiveness and of monies owed by PEC to Davidson.

27. As of January 1, 2001, Davidson had applied for and obtained three patents covering the pasteurization of shell-eggs known as the '505 Patent, the '538 Patent and the '833 Patent.

28. In reliance on the Employment Agreement, Davidson executed an assignment to PEC of the U.S. Patents '505 and '538 but not the '833, on or about December 28, 2001. These were the only assignments PEC ever requested of Davidson and which Davidson ever executed.

29. However, PEC, through its board members, immediately and materially breached the terms of the Employment Agreement. Specifically, inter alia, PEC failed to pay Davidson, it usurped Davidson's responsibilities, and it frustrated the purpose of the Employment Agreement by wrongfully terminating his employment.

30. PEC purported to terminate Davidson on or about May 30, 2001.

C.    **The PEC Board Execute and Breach a Global Settlement Agreement with Davidson.**

31. Davidson commenced an action in the Delaware Court of Chancery under section 225 of the State's General Corporation Law ("Delaware action"), to avert the unlawful actions of the Board.

32. The parties to the Delaware action reached a settlement in principle in September 2001.

11

33. Thereafter, effective as of September 20, 2001, Davidson, Rand, and the other directors of PEC entered into a Global Settlement Memorandum ("GSM"). By its terms, the parties to the GSM included Rand and the other Board Members, Antaeus, and Atlantic Capital Partners, as well as PEC.

34. The GSM contained all the essential terms of the parties agreement and was effective and enforceable as the agreement by its express terms.

35. With resignation of certain Board Members, Brody succeeded as a new member of the Board of PEC. Thus, control of PEC was with Rand, Brody, Beinecke and Arthur Blasberg.

36. Specifically, the GSM provided, inter alia:

a.      Davidson was to remain as a consultant to PEC for the period of September 20, 2001 through December 31, 2002;

b.      Rand and others agreed to pay Davidson for prior advances, payment of corporate obligations, and other compensation; and,

c.      Rand and others agreed to pay Davidson all past-due remuneration for the calendar year 2001, a monthly consulting fee, and health insurance.

37. Apart from the Settlement Note, under the GSM, Rand and the other Board Members also agreed to reimburse Davidson the legal fees and expenses incurred in connection with the Delaware litigation. That payment, in the amount of $100,000, was due on the date of the execution of the GSM. Additionally, Rand and the other Board Members also agreed to payment of compensation due Davidson as a consultant from January 2002 through September 30, 2002 in the amount of $154,147.15.

38. The GSM also provided that Davidson's patents and intellectual property issued or applied for prior to January 1, 2001 ("Old Inventiveness"), were to be PEC's property. However, any intellectual property developed by Davidson on or after January 1, 2001 - even if

12

in combination with the old inventiveness - were to remain Davidson's property ("New

Inventiveness").

39. Rand and the other Board Members, together with PEC, immediately and materially

breached the GSM.

40. Specifically, <u>inter alia</u>:

a.   Davidson was not paid the amount of $100,000 in legal fees and expenses from the Delaware litigation that were due and owing upon execution of the GSM;

b.   Davidson did not receive the past-due remuneration that he was owed;

c.   Davidson was not paid for prior advances, payments of corporate obligations, and other expenses;

d.   The Promissory Note and Security Agreement in favor of Davidson was never executed and delivered to Davidson as required;

e.   Rand and the other Board Members, through PEC, misappropriated Davidson's patents and intellectual property by claiming Old Inventiveness and New Inventiveness as belonging to PEC, without the requisite assignments or licenses from Davidson;

f.   Davidson's security position was reduced by $2.3 million by providing another lender a first lien on the security;

g.   Davidson was never paid interest on the $530,387.23 as required under the GSM;

h.   Davidson was never paid the principle due on the $530,387.23 at the conclusion of the Phase I funding;

I.   PEC never responded to Davidson that it wished to license the New Inventiveness disclosed and offered to PEC by Davidson as required under the GSM;

j.   PEC, acting through Rand and the other Board Members, violated the confidential disclosure by Davidson of New Inventiveness and knowingly acted wrongfully to gain an undivided interest in said New Inventiveness;

k.   PEC failed to pay Davidson consulting compensation in the amount of $154,147.74 for consulting services rendered from January 1, 2002 through September 30, 2002 as required by the GSM; and,

13

l.  Davidson never received royalty payments provided from the GSM for the use of his New Inventiveness which, upon information and belief, has been used continuously by PEC and NPE since February 28, 2001 (i.e., the date of Davidson filing for patent protection).

**D.   PEC Bankruptcy and DIP Loan**

41. In October 2002, PEC filed for protection under bankruptcy and its First Disclosure Statement filed in the Bankruptcy Court dated February 3, 2003 admitted "breaches" of its obligations to Davidson under the GSM.  At the same time, the Disclosure Statement acknowledged PEC's obligations to Davidson and Davidson's right to certain intellectual property subject to a license agreement to PEC.

42. Rand for himself, and as agent for Brody, and Antaeus, falsely, fraudulently, and intentionally induced Davidson to participate in the proposed DIP loan transaction by representing to Davidson, that PEC in Bankruptcy would admit its breach of the GSM, return to Davidson his intellectual property in New Inventiveness known as the "Jumbo" Patent subject to a license agreement to PEC, that Davidson would be treated as a preferred creditor with respect to certain monies owed Davidson, and that an overall settlement agreement with Davidson was reached.

43. In furtherance of this representation, Rand and others directed PEC to file a disclosure statement in Bankruptcy Court on or about February 3, 2003 which memorialized the agreement and representations made by Plaintiffs.

44. In reliance on those representations made by Rand individually, and as agent for the other named Plaintiffs, Davidson and SD Barn participated in the DIP loan transaction and, but for those representations, Davidson and SD Barn would not have participated in the DIP loans.

14

45. In May 2003, PEC's Disclosure Statement was withdrawn without Davidson's knowledge or consent, and with that withdrawal, Rand, Brody and the other PEC Board Members jointly and severally, continued to misrepresent the status of title in and to the intellectual property and continued to assert ownership rights over the Davidson New Inventiveness, including Davidson's '444 Patent and its foreign counterpart, contrary to PEC's prior commitments and contractual obligations to Davidson.

46. After the DIP loan closing, and after Davidson had committed and made substantial payment of funds, Rand, Brody and the other Board Members of PEC withdrew the promises to provide Davidson with his intellectual property, and to resolve their ongoing dispute involving monies owed and filed a revised Disclosure Statement in October 2003 that removed the representations previously made and proceeded to sell all intellectual property assets to NPE.

47. As a result of the deception by Rand, Brody and other PEC Board Members concerning their failure to honor the New Inventiveness owned by Davidson before the Bankruptcy Court, Davidson was compelled to hire counsel at significant expense to protect his interests and to protect Davidson's rights to the Davidson intellectual property.

48. In the end, as a result of the conduct of the Plaintiff, and PEC and other PEC Board members, the claims of co-ownership of intellectual property passed through to National Pasteurized Eggs, LLC ("NPE") as successor to PEC when NPE purchased PEC's assets pursuant to an asset purchase approved by the Bankruptcy Court.

49. Since the date of the transfer of the '505 and '538 patents to NPE by order of the Bankruptcy Court, Davidson has employed European Patent counsel to prosecute the foreign counterparts to the '505 and '538 Patents and "Jumbo" Patents.

15

50. Davidson has executed a Power of Attorney appointing Attorney Bart Wezenbeek, as his attorney in fact authorized to execute all necessary documents for the further prosecution of foreign patents.

51. Attorney William Toone, acting on behalf of Plaintiff, contacted Davidson regarding the execution of certain documents pertaining to the registration of a patent in Italy. Davidson indicated that he wanted a brief period of time to further investigate that request.

52. Within a very short period of time of his original request, Attorney Toone called Davidson to inform him that it was too late to file anything in Italy. Davidson is unaware of any other country wherein the registration of a patent to which NPE claims a right of ownership is currently threatened.

53. During his conversation with Davidson, Attorney Toone indicated that NPE was not interested in the "Jumbo" patent because he did not believe the process described in the patent would work.

54. Attorney Toone, despite his statement of NPE's lack of desire to assert an ownership interest in the "Jumbo" patent, has threatened to sue Davidson for patent infringement in the event Davidson begins production under the "Jumbo" patent.

55. Attorney Toone has also stated to Davidson that the claim described in the "Jumbo" patent relative to extending the shelf life of eggs by applying an antibacterial agent to the shell of the egg is a claim dependent on the precise art described in the "Jumbo" Patent and that the art described in said claim is not independent and is, therefore, in the public domain and available to NPE.

16

## COUNT I

## DECLARATORY JUDGMENT OF THE NATURE OF CLAIMS
## SET FORTH IN THE ""JUMBO" PATENT

56. The allegations of the preceding paragraphs 1-55 are incorporated herein by reference.

57. By virtue of statements made by Attorney Toone, on behalf of NPE, as to the nature of the claims set forth in the "Jumbo" patent, a real and present controversy exists as to whether or not portions of the claims set forth in the "Jumbo" patent are either independent or dependent claims and what portion, if any, of the "Jumbo" patent is within the public domain.

58. The claim set forth in the "Jumbo" patent describing the application of an antibacterial agent to the shell of the egg should be declared an independent claim that is not within the public domain.

### JURY DEMAND

59. Davidson demands a jury for all claims so triable.

### PRAYER FOR RELIEF

WHEREFORE, Defendant respectfully prays for entry of judgment as follows:

A. That the claim set forth in the "Jumbo" patent describing the process of extending the shelf life of eggs be declared an independent claim that is not within the public domain;

B. For such other and further relief as the Court deems just and equitable.

17

Respectfully submitted

Date: September 22, 2010

By:___/s/ Paul C. Bordeau_____
　　　Paul C. Bordeau
　　　NH Bar #8128
　　　25 Country Club Road
　　　Suite 502
　　　Gilford, NH 03249
　　　(603) 524-0207
　　　bordeau@metrocast.net

## CERTIFICATE OF SERVICE

I hereby certify that this pleading was served on the following persons on this date in the manner specified herein:

Electronically served through ECF: Peter G. Callahan, Esq., and D. William Toone, Esq.;

Conventionally served: L. John Davidson.

　　　　　　　　　_/s/ Paul C. Bordeau_____
　　　　　　　　　Paul C. Bordeau

18