UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

National Pasteurized
Eggs, LLC

     v.                            Civil No. 07-cv-103-JL
                                     Opinion No. 2011 DNH 009

L. John Davidson


**MEMORANDUM ORDER**

This is a dispute over the ownership of patents, and patent applications, for processes for pasteurizing chicken eggs, principally U.S. Patent No. 6,692,784, which the parties refer to as "the Jumbo."  The plaintiff, National Pasteurized Eggs, LLC ("NPE"), traces its claimed ownership to certain 2001 agreements between the defendant, L. John Davidson, and the now-defunct company he founded, Pasteurized Eggs Corporation ("PEC").  NPE says those agreements assigned the rights in the Jumbo to PEC.

After PEC declared bankruptcy in 2002, NPE purchased its assets in a sale approved by the Bankruptcy Court.  The court recognized, however, that title in the patents was "disputed and subject to the competing claims of [PEC] and Davidson" and therefore authorized PEC to convey simply "all legal and equitable rights [it] has to claim ownership" in the patents, "subject only to the competing claims of Davidson."  In re

Pasteurized Eggs Corp., No. 02-13086 (Bankr. D.N.H. July 25,
2003).  Subsequently, the United States Patent and Trademark
Office awarded Davidson a patent on the Jumbo, naming him the
sole inventor.  U.S. Patent No. 6,692,784 (issued Feb. 17, 2004).

NPE now seeks a declaratory judgment that it is "the
rightful owner of the Patent Rights conveyed by the Bankruptcy
Court Order," including the Jumbo.  While acknowledging that
those rights were conveyed "subject to" Davidson's claims, NPE
says he can no longer assert them because, among other reasons,
the statute of limitations on any claim he had against PEC for
breaching the contracts of assignment has expired.  The parties
have cross-moved for summary judgment on this issue, see Fed. R.
Civ. P. 56, with Davidson arguing that it is NPE's claim to
ownership of the Jumbo that is time-barred, because NPE failed to
bring that claim within three years of when the patent issued.
In support of his own motion for summary judgment, Davidson
further argues that his agreements with PEC actually gave
ownership of the Jumbo to him.  NPE has also moved to dismiss
Davidson's counterclaim for a declaratory judgment as to "the
nature of the claims set forth" in the Jumbo, arguing that it
fails to present a justiciable case or controversy.

This court has jurisdiction over this action between NPE, a
limited liability company with no New Hampshire members, and

2

Davidson, a New Hampshire citizen, under 28 U.S.C. § 1332(a)(1) (diversity).  Following oral argument, the parties' cross-motions for summary judgment are denied, but NPE's motion to dismiss Davidson's counterclaim is granted.

## I.  **Background**

## A.  **The Jumbo application**

In early 2002, Davidson filed an application for a patent on the Jumbo with the United States Patent and Trade Office.  U.S. Patent Application No. 10/084,444 (filed Feb. 28, 2002).  The application listed both Davidson and one Myron A. Wagner as inventors.  See 35 U.S.C. § 116.  Subsequently, on April 9, 2002, Davidson and Wagner executed a "Memorandum of Understanding" that Davidson owned all of the inventiveness claimed in the application aside from specified claims.  Wagner also assigned his inventions improving pasteurized eggs to PEC, in an assignment reciting a "Date of Signing" of February 25, 2002, but bearing a handwritten date on the signature line of April 10, 2002, i.e., the day after his agreement with Davidson.

The application for the Jumbo identifies itself as a "continuation-in-part" of a prior application, U.S. Patent Application No. 09/954,462 (filed July 11, 2000), which had since been granted, U.S. Patent No. 6,322,833 (issued Nov. 27, 2001).

And the application for the '833 patent identified itself as a "division" of a yet-prior application, U.S. Patent Application No. 08/962,766 (filed Nov. 3, 1997), which had also since been granted, U.S. Patent No. 5,843,505 (issued Dec. 1, 1998).[1]  All of the patent applications, as well as the '833 and '505 patents, named Davidson as the inventor.

**B.    Davidson's agreements with PEC**

Effective January 1, 2001, Davidson had assigned his ownership of the '505 patent to PEC, a Delaware corporation with its principal place of business in Laconia, New Hampshire.  PEC was formed that same day, as part of a transaction to fund the operations of entities Davidson had founded to develop egg pasteurization technology.  PEC purchased the assets of those entities, and Davidson was elected the chairman of PEC's board.

Initially, Davidson's employment with PEC was governed by a letter agreement, effective January 22, 2001.  In relevant part, this agreement provided that "inventions, improvements,

---

[1]"A continuation-in-part application is an application that has some subject matter in common with the parent but also has new subject matter . . . .  A divisional application is a continuing application that is based on a parent application and has the same specification except that the claims differ." Herbert F. Schwartz, Patent Law and Practice § 2.III.D.6.c, at 26-27 (5th ed. 2006) (emphases omitted).

developments, methods, processes, and ideas ("Inventions") . . .
conceived, developed or reduced to practice (. . . or which
ha[ve] been the subject of a patent application) prior to January
1, 2001 shall be [PEC's] exclusive property as against" Davidson,
who would "upon [PEC's] request . . . execute all documents
reasonably necessary to assign [his] right, title, and interest
in any such Invention."  The agreement further provided that
"Inventions conceived, developed or reduced to practice on or
after January 1, 2001, will be owned by" Davidson, but obligated
him to offer PEC an exclusive license to any such invention.

Davidson and PEC later assented to a "Global Settlement
Memorandum," effective September 21, 2001.  According to
Davidson, he and PEC entered into this settlement largely to
resolve litigation between them arising out of the company's
purported termination of his employment.  The Global Settlement
Memorandum provided that the parties' then-existing "Employment
Agreement will be cancelled by mutual consent" and that a "new

5

agreement will be substituted therefore [*sic*]."[2]  Paragraph 1 of

the Global Settlement Memorandum stated, in relevant part, that

> b.    Patents and all other intellectual property
>       applied for prior to January 1, 2001, shall be
>       owned by PEC . . . .
>
> c.    New patents or intellectual property
>       ("Inventiveness") developed prior to January 1,
>       2001 ("Old Inventiveness"), including a method for
>       extending the shelf life of pasteurized eggs by
>       treatment with antibacterial agents, shall be the
>       property of PEC . . . .
>
> d.    Inventiveness developed by [Davidson], whether in
>       combination with Old Inventiveness or prior
>       inventiveness, which results in protection from
>       new patents or patent applications providing
>       broader or improved protection, on or subsequent
>       to January 1, 2001 ("New Inventiveness") shall be
>       considered the property of [Davidson] . . . .

The memorandum required Davidson "to offer New Inventiveness

to PEC for exclusive license," the terms of which would require

it to pay him royalties and bear the costs of obtaining any

patents.

---

[2] For purposes of the summary judgment motions, the parties
agree that the Global Settlement Memorandum amounts to a binding
and enforceable agreement, notwithstanding that (1) it purports
merely to "summarize[] the provisions to be included" in
documents, yet to be drafted, that will themselves "effectuate"
those provisions and (2) no copy bearing any signature on behalf
of PEC has been located at present.  While NPE argued in its
objection to Davidson's summary judgment motion that this second
deficiency prevented him from obtaining summary judgment based on
his interpretation of the memorandum, NPE backed off from that
position at oral argument, explaining that it merely harbored
"concerns" about the document's authenticity.

The memorandum also required PEC to make certain payments to Davidson, including:  more than $530,000 in the form of a promissory note to mature no later than April 30, 2002; at least $100,000 in reimbursement for legal expenses incurred in his lawsuit against PEC; and $17,500 in consulting fees each month through at least the end of 2002.  Davidson alleges that PEC failed to make these payments and perpetrated other breaches of the Global Settlement Memorandum.

**C.    The PEC bankruptcy**

Later in 2002, PEC filed for bankruptcy protection.  In re Pasteurized Eggs Corp., No. 02-13086 (Bankr. D.N.H. Oct. 5, 2002).  PEC filed a disclosure statement in support of a proposed reorganization plan on February 3, 2003.  As Davidson points out, the disclosure statement acknowledged "a prepetition breach by [PEC] of the Global Settlement Agreement" that had jeopardized its "ability to continue using certain intellectual property," including the Jumbo, and explained that PEC and Davidson had "agreed to settle and resolve" that dispute, among others, through a "mutually acceptable written settlement agreement." That agreement was to make Davidson the owner of the Jumbo "and any improvements and new inventions conceived of at any time relating to pasteurized eggs," but would provide PEC an

7

"exclusive worldwide license" in that intellectual property, with specified royalties due to Davidson.

While Davidson argues that such an agreement was reached, his only evidence of that, aside from the disclosure statement, is a memorandum from Arthur Blasberg, Jr., one of PEC's directors, dated January 16, 2003.[3]  This memorandum, marked "For Discussion," refers to a conversation among Blasberg, Davidson, and others "regarding IP," i.e., "the so-called 'Jumbo' patent application, US 5,843,505, PCT/US 02-05771."  As Davidson points out, that is not the correct number of the Jumbo patent—-which had yet to issue at that point—-but it is in fact the correct number of the Jumbo's internationally formatted patent application.  The memorandum states that Davidson "is the owner of US 5,843,505 and PCT/US 02-05771 with the exception of those claims credited to" Wagner, but that PEC "will have an exclusive 'Right of First Refusal' for a global and perpetual license" on that intellectual property, on condition that PEC's reorganization plan provided for certain payments to Davidson.

---

[3]The memorandum purports to "clarify (and in some cases expand on) Jim's earlier memo, dated January 10, 2003, regarding IP." It appears that "Jim" is James H. Rand, another PEC director. While Davidson has submitted an e-mail from Rand bearing that date, it makes no reference at all to intellectual property or any other subject discussed in Blasberg's memorandum. Nor does the letter from Davidson to Rand, dated January 10, 2003, to which Davidson says Rand's e-mail was a reply.

The memorandum further states that PEC "will support Davidson in his engaging" patent counsel, and there is some evidence that subsequently occurred.  There is no other evidence, though, that either PEC or Davidson ever manifested its assent to the terms set forth in Blasberg's memorandum.  Davidson later filed an amended application for the Jumbo deleting all claims to which Wagner, in his agreement with Davidson, see Part I.A, supra, had retained any claim to co-inventorship.  Amendment to U.S. Patent Application No. 10/084,444 (filed Mar. 24, 2003).

As NPE points out, the disclosure statement PEC originally filed in the Bankruptcy Court contains a "disclaimer" that "as to contested matters . . . , [it] shall not constitute or be construed as an admission of any fact or liability, stipulation or waiver, but rather as a statement made in settlement negotiations" (capitalization omitted).  NPE further points out that PEC soon filed an amended disclosure statement noting, as to Davidson's interest in any intellectual property, only that he had "reserved the right to assert claims against the patents issued to him and against certain additional inventions which are subject to a patent pending proceeding."  PEC later withdrew its disclosure statement altogether, after the official committee of its unsecured creditors moved to convert the reorganization proceedings to a liquidation.

9

To that end, PEC entered into an asset purchase agreement with NPE providing for the conveyance of "all of [PEC's] right, title and interest in all of [its] real and personal property," including "Intellectual Property" set forth in an attached schedule.  The schedule listed the then-pending application for the Jumbo, among other patents, applications, and trademark registrations.  NPE moved the Bankruptcy Court for approval of the sale, but Davidson objected to holding a hearing on that motion and, eventually, to the motion itself, on the grounds that he was "the owner of and has exclusive rights to a substantial portion of the patents and patent applications" listed on the schedule, including the Jumbo.  Davidson argued that PEC had "no rights under the Global Settlement Agreement and the Employment Agreement by virtue of its failure to perform."

A few days later, Davidson commenced an adversary proceeding against PEC in the Bankruptcy Court, seeking a declaratory judgment that he was the "sole and exclusive owner" of the disputed intellectual property, including the Jumbo patent application.  Davidson v. Pasteurized Egg Corp. (In re Pasteurized Egg Corp.), No. 02-13068 (Bankr. D.N.H. July 8, 2003).  Consistent with his allegations here, Davidson claimed that "PEC's multiple breaches of the [Global Settlement Memorandum] relieved him of . . . any obligation to assign

10

further intellectual property interests to PEC."  Inconsistent
with his allegations here, however, Davidson also stated that the
settlement referred to in PEC's disclosure statement "was at no
point in time consummated."

In the meantime, PEC had submitted an amended version of the
asset purchase agreement, dividing the subject intellectual
property into two separate schedules, 1.24A and 1.24B.  The
amended version provided that the intellectual property listed on
schedule 1.24A "shall be sold to [NPE] free and clear of all
Liens and property interests . . . asserted by" Davidson, but
that the intellectual property on schedule 1.24B "shall be sold
to [NPE] subject only to any Liens and property interests
asserted by" Davidson.  The Jumbo appeared on schedule 1.24B.

When both NPE and PEC filed responses to Davidson's
objection to the motion to approve the sale, each drew a
distinction between the intellectual property listed on schedules
1.24A and 1.24B.  NPE explained that "PEC [was] not attempting to
sell Davidson's purported ownership interest" in the property
listed on schedule 1.24B but conveying it "only to the extent of
[PEC's] interest therein, and expressly subject to any claims of
Davidson" so that his "ownership rights, if any, are fully
preserved, and will be determined in a subsequent adversary
proceeding.  In the meantime, the sale can be approved."

11

Similarly, PEC's filing claimed exclusive ownership of the property listed on schedule 1.24A, but acknowledged a "legitimate dispute" with Davidson as to the ownership of the property listed on schedule 1.24B.  Invoking the Bankruptcy Court's authority to approve the sale of the debtor's property even when it was "the subject of a bona fide dispute," PEC asked the court to allow the sale of its assets to NPE under the revised asset purchase agreement.  That approach, PEC urged, would allow the sale to proceed while ensuring that Davidson's "alleged interests will pass through [the bankruptcy] proceedings unaffected."

The Bankruptcy Court did exactly that.  In an order "partially resolving the sale motion," the court noted that Davidson's objection raised many difficult legal and factual issues" as to ownership of the Jumbo patent application, which were "not insubstantial and not without some factual predicate." In re Pasteurized Egg Corp., No. 02-13086, slip op. at 8 (Bankr. D.N.H. July 15, 2003).  Yet the court could not resolve those issues "within the time frame [in] which the Court must rule on the Sale Motion" because deciding "the extent of the Debtor's interest in property is a lengthy and time consuming undertaking" that "may only be made in an adversary proceeding."  Id. at 5. Instead, the court ruled that it would "only approve the Sale Motion with language that will preserve the ability of NPE and

Davidson to pursue a decision on the merits of any dispute over the ownership of the [Jumbo] patent application, and the prosecution of such application, in any appropriate forum(s)." Id. at 8.  The court did, however, rule that "all of Davidson's rights under the . . . '505 Patent belong to" PEC, and would therefore pass to NPE, by virtue of his January 1, 2001, assignment of those rights.  Id. at 10.

The Bankruptcy Court later issued an order granting the motion to approve the sale.  In re Pasteurized Egg Corp., No. 02-13086, slip op. at 8 (Bankr. D.N.H. July 25, 2003).  This order stated that PEC had "good, valid and marketable title to" the property listed on schedule 1.24A, including the '505 patent, as to which it was "the specific finding of [the] Court that Davidson previously assigned all of his rights . . . to [PEC], which rights shall pass to NPE as the result of the Closing." Id. at 2-3.  But, as to the property listed on schedule 1.24B, the order provided that

> title in said assets is disputed and subject to the competing claims of [PEC] and Davidson.  Accordingly, [PEC] is authorized to convey to NPE all legal and equitable rights [PEC] has to claim ownership in the assets listed on Schedule 1.24B[], subject only to the competing ownership claims of Davidson.

Id. at 3.  The closing on the asset purchase agreement took place in August 2003.

13

**D.    Issuance of the Jumbo patent**

In the meantime, in July 2003, PEC had petitioned the USPTO for a variety of relief as to the Jumbo patent application, including the reinstatement of Wagner's claims, the reinstitution of him to co-inventor status, and permission to direct the prosecution of the application.  PEC explained that Davidson had refused to cooperate with it in prosecuting the applications based on his position that he was its sole owner, despite, among other claimed evidence of PEC's "proprietary interest," the employment and global settlement agreements, as well as the assignment of Wagner's interest to PEC.

Davidson then filed a complaint against NPE in this court, seeking a declaratory judgment that he owned, <u>inter alia</u>, the Jumbo application.  <u>Davidson v. Nat'l Pasteurized Eggs, LLC</u>, No. 03-377 (D.N.H. Aug. 27, 2003).  He claimed that PEC, and hence NPE, had no rights to the application through any assignment from either Wagner (because the application no longer incorporated any of his inventiveness) or Davidson (because PEC had breached the employment agreement and the Global Settlement Memorandum).

The USPTO subsequently denied the relief sought by PEC, ruling that its rights in that application had been extinguished by the deletion of Wagner's claims.  Ultimately, the USPTO

14

granted the application, resulting in a patent naming Davidson as the sole inventor.  U.S. Patent No. 6,692,784 (issued February 17, 2004).  The patent claims, <u>inter alia</u>, a "method of pasteurizing in-shell chicken eggs" by placing them in fluid heated to different specified temperatures, removing them after a specified reduction in their bacterial concentration, and contacting them with an antibacterial agent after they cool.

Just before the issuance of the patent, Davidson filed a stipulation dismissing his action against NPE in this court, without prejudice.  There is no evidence that Davidson and NPE had any contact again until more than three years later, just before NPE commenced this action against Davidson on April 6, 2007.  NPE alleges that, in the weeks prior to that filing, Davidson "asserted that he owns and controls" the rights to certain patents, including the Jumbo, "in contravention of his obligations" under the employment and Global Settlement Memorandum and the Bankruptcy Court's order granting the sale motion.  NPE alleges that Davidson has thus jeopardized several of its pending international patent applications "derived from" those patents.

## II.   **The cross-motions for summary judgment**

## A.   **Applicable legal standard**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  Under this rule, "[o]nce the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer 'definite, competent evidence to rebut the motion.'"  Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).

Where, however, "the party moving for summary judgment bears the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that issue is conclusive." EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de P.R., 279 F.3d 49, 55 (1st Cir. 2002) (quotation marks omitted).  This standard applies both to NPE's motion for summary judgment, since it bears the burden of proving its claim for a declaratory judgment of ownership, see Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 95 (1993), and to Davidson's arguments that the claim is barred by the statute of limitations or the doctrine of laches, which are affirmative

16

defenses placing the burden of proof on the party asserting them,
see Fed. R. Civ. P. 8(c)(1).

In ruling on a motion for summary judgment, the "court must
scrutinize the record in the light most flattering to the party
opposing the motion, indulging all reasonable inferences in that
party's favor." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19
(1st Cir. 2003).  On cross-motions for summary judgment, "the
court must consider each motion separately, drawing inferences
against each movant in turn." Merchants Ins. Co. of N.H., Inc.
v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998)
(quotation marks omitted).

**B.   Analysis**

**1.   NPE's motion for summary judgment**

NPE seeks summary judgment "on the ground that Davidson has
no claim" to the Jumbo and related international patent
applications.  NPE argues that, through the Bankruptcy Court's
order approving PEC's asset sale, that intellectual property was
"conveyed by PEC to NPE, subject only to the competing claims of
Davidson, and any competing ownership claims [he] might once have
had based on a breach of contract theory are now time-barred."

Specifically, NPE asserts that, "[i]f PEC breached one of
its contracts with Davidson," e.g., the employment agreement or

17

the Global Settlement Memorandum, "and Davidson could establish entitlement to the [Jumbo] as a remedy," he was obligated to bring suit for that remedy within three years of the alleged breach.  See N.H. Rev. Stat. Ann. § 508:4, I ("all personal actions . . . may be brought only within 3 years of the act or omission complained of").[4]  This period has long expired, NPE says, in light of Davidson's allegations that PEC breached those agreements "immediately" after entering into them in 2001.

This argument is fundamentally inconsistent with the nature of statutes of limitations, which cannot be used "as a means of obtaining affirmative relief."  Guild v. Meredith Vill. Sav. Bank, 639 F.2d 25, 27 (1st Cir. 1980) (applying New Hampshire law).  As the court of appeals recognized in Guild, "[i]t is axiomatic that the statute of limitations is a shield, not a sword.  At both the federal and state levels it has long been established that the statute is available only as a defense and not as a cause of action."  Id. (citing Fowler v. Taylor, 97 N.H. 294, 297 (1952)).  Thus, the court ruled that the plaintiffs,

---

[4]The parties agree that New Hampshire law governs the statute of limitations issue.  See Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys, Inc., 583 F.3d 832, 846 (Fed. Cir. 2009) ("Stanford") (applying state statute of limitations to claim for declaratory judgment of ownership), cert. granted, 78 U.S.L.W. 3851 (U.S. Nov. 1, 2010) (granting certiorari on an unrelated question).

successors to a borrower's rights in property he had pledged as collateral for his yet-unpaid debt to the defendant, could not obtain ownership of the property from the defendant on the theory that the limitations period had expired on any claim by the defendant to recover on the debt.  See id.

NPE, as the successor to PEC's rights in the Jumbo under its agreements with Davidson allegedly assigning those rights, likewise cannot obtain ownership of the Jumbo against him on the theory that the limitations period has expired on any claim by him for PEC's breach of those agreements.  NPE cannot use the statute of limitations to secure substantive rights that it does not already possess, as the successor to PEC's interest in its agreements with Davidson or otherwise.  See id.

NPE insists that it is not using the statute for that purpose, but merely to get a declaration of its "non-liability" to Davidson on his claim that PEC breached its agreements with him because that claim is now time-barred.  First of all, though, that characterization of NPE's sought-after relief is flatly inconsistent with its amended complaint, which states that "NPE seeks a declaratory judgment of rightful ownership" of the Jumbo, and prays for a declaration that NPE "owns all right, title and interest in the Jumbo."  NPE's motion for summary judgment and supporting memoranda repeatedly ask for precisely the same relief

on the theory that "Davidson's claims to ownership are barred by the applicable statute of limitations."  So this is plainly not an action for declaratory relief "based on the statute of limitations applying to the defendant's prospective claim." Indeed, that relief, if granted here, would not establish NPE's ownership of the Jumbo, which is the matter in controversy.  It would establish only that NPE cannot be held liable to Davidson on any claim that PEC breached its agreements with him, which does not appear to be in controversy at all.

An essential premise of NPE's statute of limitations argument, in fact, is that Davidson did not accuse PEC of breaching the agreements at any point between the dismissal of his August 2003 suit against NPE in this court and the filing of his answer and counterclaim in this matter.  That distinguishes the case on which NPE principally relies for the proposition that "a declaratory judgment plaintiff can obtain relief based on the statute of limitations applying to a defendant's prospective claim."  Luckenbach Steamship Co. v. United States, 312 F.2d 545 (2d Cir. 1963).  There, as NPE recognizes, the plaintiff sought "a declaration that it is not liable to the defendant on a claim which has been asserted, but on which the defendant has failed to bring suit."  Id. at 547 (emphasis added).  As the same court that decided Luckenbach explained in a later decision, a

plaintiff may thus use the statute of limitations as the basis of a declaratory judgment action brought "to fend off an actively pursued claim of the defendant," but may not "extend the intrinsically defensive doctrine beyond its confines" as the "aggressor" against a defendant who has himself "done nothing concrete to change the basic relationship between the parties." 118 E. 60th Owners, Inc. v. Bonner Props., Inc., 677 F.2d 200, 204 (2d Cir. 1982); see also City of St. Paul, Alaska v. Evans, 344 F.3d 1029, 1033-34 (9th Cir. 2003) (describing the Luckenbach decision as "permitting [plaintiff] to seek a declaratory judgment of non-liability in response to [a] claim").

By NPE's own account, Davidson has played just such a passive role here, at least since he voluntarily dismissed his lawsuit against NPE from this court in August 2003.  Moreover, while that action asserted PEC's alleged breach of the agreements, viz., its non-payment, it did not do so as a basis for NPE's liability to Davidson in damages, but only as a basis for a declaration that he owned the Jumbo notwithstanding those agreements.  Because Davidson has never sought to hold NPE liable for breaching the agreements, it would have no basis for seeking a declaration of its non-liability to him, whether by virtue of the statute of limitations or otherwise--and, again, that is plainly not the relief NPE is seeking here anyway.

Davidson is, of course, asserting PEC's breach of the agreements as a defense to NPE's claim of ownership in this action, and at oral argument NPE took the position that the statute of limitations should "at least" prevent him from doing that because, again, more than three years have passed since any alleged breach.  But, as <u>Luckenbach</u> itself recognizes, "[t]he law is well settled that limitations do not usually run against a defense."  312 F.2d at 549 n.3.

As the Supreme Court has held, "a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded survives the expiration of the period of limitation that would otherwise bar the [defense] as an independent cause of action."  <u>Beach v. Ocwen Fed. Bank</u>, 532 U.S. 410, 415 (quotation marks omitted).  The Court explained that "the object of a statute of limitation in keeping stale litigation out of the courts would be distorted if the statute were applied to bar an otherwise legitimate defense to a timely lawsuit, for limitation statutes are aimed at lawsuits, not at the consideration of particular issues in lawsuits."  <u>Id.</u> at 415-16.  Worse still, this approach "would provide an incentive to delay bringing some claims until a defense would be time-barred," so as "to permit a party to place a question before a court and then prevent the

opposing party from disputing issues lying at the foundation of the claim." 118 E. 60th Owners, 677 F.2d at 203.

In light of this authority, there is no merit to NPE's argument that Davidson's failure to sue it or PEC for breach of the agreements allegedly effecting the assignment of the Jumbo somehow prevents him from raising those breaches as a defense to NPE's claim that those very agreements gave it sole ownership of the Jumbo. See Merrell v. Renier, No. 06-404, 2007 WL 391546, at *2 (W.D. Wash. Jan. 22, 2007) (ruling that the statute of limitations did not preclude defendant from raising plaintiff's breach as a defense to a contract claim).

Nor is there any merit to NPE's suggestion that the Bankruptcy Court's order approving the sale of PEC's assets somehow obligated Davidson to sue to establish his ownership of the Jumbo.  While the order authorized PEC "to convey to NPE all legal and equitable rights [PEC] has to claim ownership in the assets listed on Schedule 1.24B" of the asset purchase agreement, including the Jumbo, it expressly preserved "the competing ownership claims of Davidson" to those assets.  That was not tantamount to a ruling that the sale would give NPE sole ownership of the schedule 1.24B assets, either automatically or unless Davidson brought a timely claim contesting ownership.

23

To the contrary, the Bankruptcy Court ruled not only that Davidson had raised legitimate issues as to his ownership of the Jumbo application, but that the court would "only approve the Sale Motion with language that will <u>preserve the ability of NPE and Davidson to pursue a decision on the merits</u> of any dispute over the ownership of the [Jumbo] patent application" (emphasis added). NPE does not explain how this ruling, which preceded the ultimate approval of the asset sale, would have obligated Davidson to sue to establish his ownership against NPE--any more than it would have obligated NPE to sue Davidson to establish its ownership against him.[5] Again, the Bankruptcy Court's order sought to <u>preserve</u> each party's right to bring such an action, not to condition or limit that right--as starting the running of a limitations period on the action necessarily would.

Moreover, in seeking approval of the proposed sale, NPE told the Bankruptcy Court that PEC was "<u>not</u> attempting to sell Davidson's purported ownership interest" in the property listed on schedule 1.24B but conveying it "only to the extent of [PEC's]

---

[5]In its reply brief in support of its summary judgment motion, NPE suggests that the Bankruptcy Court's order amounted to "notice" of NPE's claim to the Jumbo that required Davidson to sue it within the next three years on pain of losing his ownership interest. This "notice" theory is also the central premise of Davidson's statute of limitations defense against NPE, which the court rejects for the reasons explained <u>infra</u>.

interest therein," while PEC explained that Davidson's claim to that property would "pass through the [bankruptcy] proceedings unaffected."  It is difficult, if not impossible, to reconcile these statements with NPE's position here that the order essentially gave it presumptive ownership of the Jumbo and other schedule 1.24B assets against Davidson, so that his failure to bring suit alleging otherwise within the next three years would itself settle what PEC acknowledged was a "legitimate dispute" over which of them owned those assets.[6]

If NPE were correct, then Davidson's interest in the Jumbo did not in fact pass through the PEC bankruptcy "unaffected," but encumbered by what would in essence be a springing executory interest in favor of NPE.  That is plainly neither what PEC and NPE asked the Bankruptcy Court to do, nor what it did.  NPE's statute of limitations arguments do not entitle it to summary judgment on its ownership claim or any defense to it based on

---

[6]Because NPE and its predecessor-in-interest, PEC, made these statements in successfully obtaining the Bankruptcy Court's approval of the asset sale over Davidson's objection, NPE is likely judicially estopped from arguing to the contrary in this litigation.  See, e.g., Perry v. Blum, ___ F.3d ___, 2010 WL 3815776, at *5-*8 (1st Cir. Oct. 1, 2010).  The court need not resort to that doctrine, however, to reject NPE's argument that the sale order had any effect on Davidson's rights to the Jumbo.

PEC's alleged breach of its agreements with Davidson.[7]  Its
motion for summary judgment is denied.

## 2.   Davidson's motion for summary judgment

### a.   Statute of limitations

As noted at the outset, Davidson also invokes the statute of
limitations in moving for summary judgment against NPE, arguing
that it failed to sue him within three years of the 2004 issuance
of the Jumbo patent naming him as the sole inventor.[8]  This
development, Davidson explains, amounted to a "claim of ownership
to the Jumbo Patent in derogation of NPE's alleged rights,"
obligating NPE to "challenge Davidson's ownership" within the
next three years.  Because NPE failed to do so, Davidson asserts,
the statute of limitations bars it "from enforcing whatever
rights, if any, it may possess in the Jumbo Patent and its
foreign counterparts."

---

[7]Because NPE does not seek summary judgment against this
defense on any other basis, this court expresses no view on its
merits other than that the statute of limitations does not bar
it.

[8]NPE had argued that Davidson failed to raise the statute of
limitations in his answer, but eventually did not object to his
motion to amend his answer to add the defense.  The court takes
this as a withdrawal of any argument based on Davidson's initial
failure to raise a limitations defense.

In line with its rejection of NPE's limitations argument, however, this court simply cannot conclude that ownership of a patent can be settled in this fashion.  Davidson simply assumes, without any supporting authority or developed argument, that the limitations period on a claim for ownership of a patent starts to run when the plaintiff is put "on notice" that the defendant asserts a right to the patent in question.  The weakness in that argument is obvious.  Anyone can send a letter to, say, Google, claiming that he owns its patents--thus putting Google "on notice"--and it is surely not the case that, if Google does not respond by filing suit within the applicable limitations period, title to its patents is lost to the letter-writer.[9]

Admittedly, there is some case law (though not cited on this point by either party) which appears to hold that the limitations

---

[9]When confronted with this hypothetical at oral argument, counsel for Davidson dismissed it because "Google owns the patents."  But that is precisely the court's point:  alleged ownership cannot ripen into actual ownership simply by virtue of a failure to respond to the allegation.  It should also be noted that the hypothetical is not far-fetched by any means: successful businesses often receive correspondence from so-called "patent trolls" claiming that they are the rightful owners of technology the business uses or sells, and demanding license fees or royalties.  See, e.g., Daniel J. McFeely, An Argument for Restricting the Patent Rights of Those Who Misuse the U.S. Patent System to Earn Money Through Litigation, 40 Ariz. St. L.J. 289 (2008).  This court is not aware of any authority that, by deciding not to dignify such demands with a response, the businesses imperil their patent portfolios.

period on a claim for ownership of a patent does indeed begin to
run when the plaintiff receives notice of the defendant's adverse
claim.  See Stanford, 583 F.3d at 846-48 (applying California
law); Kimberly Corp. v. Hatley Pen Co., 237 F.2d 294, 301 (9th
Cir. 1956) (same).  These cases, however, did not apply New
Hampshire law, nor do they even mention the fundamental problem
just outlined, so this court has no reason to think the New
Hampshire Supreme Court would follow them.[10]  Indeed, if those
decisions are correct, they effectively mean that "title to a
patent can be acquired through adverse possession," which, as one
federal court recently noted, is a proposition unknown to the law
at present.[11]  Picture Patents, LLC v. Terra Holdings LLC, Nos.

---

[10]There does not appear to be any decision from the New
Hampshire Supreme Court, or from this court, discussing this or
any remotely analogous issue.  But it should be noted that, under
New Hampshire law, the limitations period begins running upon
"the act or omission complained of, except . . . when the injury
. . . could not reasonably have been discovered" at that point,
in which case the period starts running when "the plaintiff
discovers, or in the exercise of reasonable diligence should have
discovered, the injury."  N.H. Rev. Stat. Ann. § 508:4, I.  One
of the problems with the argument that the defendant's mere claim
to ownership starts the limitations period on the plaintiff's
ownership action is that the adverse claim itself does not
necessarily cause "injury" to the plaintiff.  Here, for example,
NPE alleges that Davidson's claim to sole ownership of the Jumbo
did not start harming NPE until that claim jeopardized some of
its related international patent applications—-at which point NPE
promptly commenced this action against Davidson.

[11]It should also be noted that "notice" of an adverse claim
alone does not establish adverse possession under New Hampshire

07-5465, 07-5567, 2008 WL 5099947, at *3 n.1 (S.D.N.Y. Dec. 3, 2008) (citing McFeely, supra, 40 Ariz. St. L.J. at 318).

Furthermore, even if the limitations period does begin to run when the plaintiff is put "on notice" of the defendant's adverse claim, Davidson has not established that the issuance of the Jumbo patent accomplished that sort of notice to NPE. First, Davidson (who, again, bears the burden of proving his statute of limitations defense, see Part II.A, supra) has not come forward with any evidence that NPE knew, at any point three years or more before it brought this lawsuit, that the patent for the Jumbo had in fact issued. Second, even if NPE did come to know during that period that a patent for the Jumbo had issued naming Davidson as the inventor, that does not amount to notice that he was claiming to be the owner of the patent—-which, as he acknowledges, is not the same as the being the inventor.

As this court recently explained, "[i]nventorship is the 'question of who actually invented the subject-matter claimed in a patent,' whereas ownership is the 'question of who owns legal

_____

law, which requires the adverse claimant to make open and continuous use of the property, and to do so for much longer than three years. See, e.g., Burke v. Pierro, 159 N.H. 504, 512 (2009). This is yet another reason to disbelieve that New Hampshire law would bar a plaintiff's action for ownership of a patent merely because three years have passed since he first knew the defendant claimed to own the patent instead.

title to the subject-matter.'" Fin Brand Positioning, LLC v.
Take 2 Dough Prods., Inc., 2010 DNH 189, 10 (quoting Beech
Aircraft Corp. v. EDO Corp., 990 F.2d 1237, 1248 (Fed. Cir.
1993)).  Since ownership of the patent "'initially vests in the
inventor, who may then . . . transfer that right to another,'" a
determination of inventorship may settle disputes over ownership.
Id. (quoting Beech Aircraft, 990 F.2d at 1248).  But that is not
always the case, see id. at 10-12, and it is not the case here.
NPE does not dispute Davidson's claim that he invented the Jumbo;
instead, it disputes his claim that he continues to own the Jumbo
notwithstanding his agreements with PEC allegedly assigning his
ownership—-which, of course, he had acquired in the first place
by virtue of his inventorship.  So, when the USPTO issued a
patent on the Jumbo naming Davidson as the inventor, that
development was in no way adverse to (and, indeed, was perfectly
consistent with) NPE's claim to ownership of the Jumbo.  It
follows that issuance of the Jumbo patent did not start the
limitations clock on NPE's claim for ownership, even assuming
that (1) NPE knew of that development more than three years prior
to its commencement of this action and (2) the statute starts to
run against an ownership action upon the defendant's adverse
claim, despite the problems with that theory just discussed.

Davidson also makes an alternative statute of limitations argument that, similar to NPE's, attempts to reframe this ownership dispute as a breach of contract action.  Davidson argues that, because NPE derives its claimed ownership of the Jumbo from PEC's rights under its employment and global settlement agreements with Davidson, which "the parties appear to acknowledge . . . [were] breached at the inception," NPE needed to bring its ownership claim within the next three years.

What "the parties appear to acknowledge," though, is that PEC breached the employment and global settlement agreements, by failing to make the required payments and the like--not that Davidson did.  Davidson does not explain why PEC's breach of the agreements would start the limitations period on its claim against him to enforce them.  In any event, as NPE points out, its claim is that it owns the Jumbo because Davidson made the employment and global settlement agreements--which effected an assignment of the Jumbo--not because Davidson breached those agreements.  As the court already explained in rejecting NPE's similar limitations argument, while the agreements, and the effect of PEC's breach of them, are central to this case, this is not an action for breach of contract in the sense that one party is trying to hold the other liable for failing to perform under

their agreement.  Davidson's statute of limitations arguments do not entitle him to summary judgment.[12]

### b.  Other arguments

Davidson also seeks summary judgment on several other grounds:  (1) that NPE's claim is barred by laches, (2) that, under the Global Settlement Memorandum, the Jumbo amounts to "New Inventiveness" which "shall be considered the property of" Davidson, and (3) that, in any event, PEC and Davidson agreed in 2003 that he owned the Jumbo, as evidenced by the memorandum by Blasberg, see Part I.C, supra.  To start with, though, Davidson raised each of these arguments for the first time in his 25-page reply memorandum in support of his summary judgment motion, omitting them from his 11-page opening memorandum.  This court ordinarily disregards arguments raised for the first time in reply, see, e.g., Doe v. Friendfinder Network, Inc., 540 F. Supp. 2d 288, 303 n.16 (D.N.H. 2008) (citing L.R. 7.1(e)(1)), and is particularly inclined to do so here, where Davidson's counsel's

---

[12]Insofar as Davidson suggests, in his reply memorandum in support of his summary judgment motion, that the statute started running against NPE's ownership action upon his claims to the Jumbo in both the Bankruptcy Court and the action he filed against NPE in this court, that argument is rejected because (1) it was raised for the first time in reply, see infra, and (2) it depends on the notion that a claim for ownership of a patent accrues upon notice of an adverse claim to it, which this court cannot accept, for the reasons just explained.

repeated difficulties in complying with the local rules have
unnecessarily consumed the resources of both NPE and the court,
see Order of June 9, 2010.  In any event, each of these arguments
raises a number of disputed factual issues that cannot be
resolved on summary judgment.

### i.  Laches

Under New Hampshire law, "laches will constitute a bar to
suit only if the delay is unreasonable and prejudicial."  In re
Est. of Laura, 141 N.H. 628, 635 (1997) (quotation marks
omitted).  Davidson—-who, again, bears the burden of proving
laches, an affirmative defense, see Part II.A, supra—-has not
conclusively shown that any delay by NPE in bringing this action
was either unreasonable or prejudicial.

Davidson's argument that the delay was unreasonable relies
solely on the proposition that NPE "brought its claims . . .
outside the statutory period of limitation,"[13] but that

_____

[13]Indeed, relying on federal case law, Davidson argues that
this fact gives rise to a presumption that the delay was
unreasonable and prejudicial, relieving him of the burden of
proving those elements.  As NPE points out, however, federal law
does not govern Davidson's laches defense here:  because, as
Davidson acknowledges, state law governs NPE's ownership claim,
see, e.g., HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co., 600
F.3d 1347, 1356-57 (Fed. Cir. 2010), state law governs Davidson's
laches defense to that claim as well, see 4 Charles Alan Wright
et al., Federal Practice & Procedure § 1045, at 191 (2d ed.
2002); see also note 4, supra.  In any event, even if federal law

proposition is incorrect, as just discussed.  And Davidson's argument that the delay was prejudicial relies on the "belie[f]" of his long-time personal assistant that he will not "be able to effectively function as a witness" in this matter, because "prompt and clear memory under pressure of time to respond" is "beyond [his] current capabilities."  There are numerous problems with this argument, but for present purposes it suffices to say that, as Davidson acknowledges, NPE holds a different view of his faculties "based on [its] limited experience and contact with him," creating a genuine issue of fact for trial (at which the court intends to allow Davidson to testify without any undue "pressure of time to respond").  Davidson is not entitled to summary judgment on the strength of his laches defense.

### ii. The Global Settlement Memorandum

Davidson's argument that the Global Settlement Memorandum actually gave ownership of the Jumbo to him relies on the provision that "'New Inventiveness'" shall be considered the property of" Davidson.  The memorandum defines "New Inventiveness" as "Inventiveness developed by [Davidson], whether in combination with Old Inventiveness or prior inventiveness,

---

did apply, Davidson has not shown that NPE brought this action
outside of the limitations period, as just discussed.

which results in protection from new patents or patent applications providing broader or improved protection, on or subsequent to January 1, 2001." Davidson argues that, under this definition, his ownership of the Jumbo "depends only upon whether it contains new processes or intellectual property" (which is how the memorandum defines "Inventiveness"), which he says it does, based on his contemporaneous correspondence with patent counsel.

But even assuming this reading of the memorandum is correct (which NPE vigorously disputes, and which the court need not decide at the moment), Davidson has not come forward with any admissible evidence showing that, on or subsequent to January 1, 2001, he in fact developed any processes or intellectual property that are, to use (but not to adopt) his phrase, "contained" in the Jumbo. The documents he cites address that point elliptically at best and, as NPE points out, are inadmissible hearsay anyway because they consist of letters written by Davidson himself.[14]  See Fed. R. Evid. 801(c).  "It is black-letter law that hearsay evidence cannot be considered on summary judgment." Davila v. Corporacion P.R. Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007).  As a result of this shortcoming

---

[14]For reasons that are not apparent to the court, Davidson has not submitted any testimony discussing his alleged development of the new inventiveness embodied in the Jumbo.

35

(leaving aside any others for the moment), Davidson is not entitled to summary judgment based on his interpretation of the Global Settlement Memorandum.

### iii. The alleged 2003 agreement

Nor is Davidson entitled to summary judgment based on his alleged agreement with PEC that he was the owner of the Jumbo, as evidenced by Blasberg's January 2003 memorandum. Among other problems with this theory: (a) the memorandum actually says that Davidson owns the '505 patent, not the Jumbo patent (which had yet to issue at that point), and Davidson's unauthenticated claim that Blasberg intended to say otherwise at best leaves a factual dispute on this issue, (b) the memorandum is marked "For Discussion," calling into question whether it was intended as a formal offer, and Davidson has not adduced any other evidence on that point, and (c) Davidson himself stated in his adversary complaint against PEC in the Bankruptcy Court that this agreement "was at no point in time consummated."

## III. NPE's motion to dismiss Davidson's counterclaim

As noted at the outset, NPE has moved to dismiss Davidson's counterclaim for a declaratory judgment as to "the nature of the claims set forth" in the Jumbo, arguing that it fails to present a justiciable case or controversy. Davidson alleges that "a real

and present controversy exists as to whether or not portions of the claims set forth in the 'Jumbo' patent are either independent or dependent claims and what portion, if any, of the 'Jumbo' patent is within the public domain."  This is so, Davidson says, because NPE's counsel told him at some point that a certain claim set forth in the Jumbo patent "is a claim dependent on the precise art described in the 'Jumbo' [p]atent and that the art described in said claim is not independent and is, therefore, in the public domain and available to NPE."

The court cannot claim to understand this allegation completely.  Regardless, the court does not believe that, simply because a party asserts that a certain claim in a patent is invalid--if that is even in fact what Davidson is alleging NPE to have done—-a justiciable controversy exists regarding the validity of that claim as a matter of patent law.  Indeed, even "[a] vague and inspecific desire to practice an invention if a patent should turn out to be invalid"--which Davidson has not alleged NPE to harbor—-is not enough to make out a justiciable claim for declaratory relief as to the validity of the patent. Windsurfing Intl. Inc. v. AMF Inc., 828 F.2d 755, 758 (Fed. Cir. 1987) (internal quotation marks and bracketing omitted).

In any event, while the voluminous briefing and other materials submitted on the parties' cross-motions for summary

judgment do not reveal the relevance of this alleged public domain argument to the ownership of the Jumbo, the court will certainly decide that issue, and any other issue as to the scope of the patent, if necessary to resolve the ownership question. So, even if Davidson's counterclaim does not fail to present a justiciable case or controversy, it is moot anyway.  NPE's motion to dismiss the counterclaim is granted.

**IV.   <u>Conclusion</u>**

For the foregoing reasons, NPE's motion for summary judgment[15] is DENIED, and Davidson's motion for summary judgment[16] is DENIED, but NPE's motion to dismiss[17] is GRANTED.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  January 14, 2011

cc:  D. William Toone, Esq.
     Peter G. Callaghan, Esq.
     L. John Davidson, pro se

---

[15]Document no. 65.

[16]Document no. 79.

[17]Document no. 52.