UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\*                                              \*
\*     **National Pasteurized Egg**             \*
\*                                              \*
\*              v.                              \*      Doc. No. 07-CV-00103-JL
\*                                              \*
\*         **L. John Davidson**                 \*
\*                                              \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF JUDGEMENT
FOR THE DEFENDANT L. JOHN DAVIDSON**

*I. FACTUAL OVERVIEW*

1.      For many years Mr. Davidson has spent considerable time, effort, and money in the development and commercialization of a process to bring pasteurized eggs to the market place. Initially a limited partnership, (PE-LP) was formed in order to achieve that goal. Sometime in the late fall of 2000, PE-LP began to explore future development with independent investors. It resulted in the formation of a corporation which would soon become Pasteurized Eggs Corporation (P.E.C.) to advance the commercialization of pasteurized eggs. Initially, Mr. Davidson pledged and thereafter assigned his Patents in what is known as the '505 and the '538 patents. (See Defendant's Ex. A).

2.      Thus beginning in January 2001, Pasteurized Egg Corporation (P.E.C.) was formed. On January 22, 2001, P.E.C. and Mr. Davidson entered into an Employment Agreement (Defendant's Ex. B) in order to move the company forward. At the time, Arthur Blasberg (Blasberg) and Mr. Davidson were on the Board of Directors of the newly formed Corporation (P.E.C.). Unbeknownst to Mr. Davidson and Mr. Blasberg, a band of directors headed by Daniel Best, William Gorman, and Mr. Armand Norehad began efforts to remove both Mr. Davidson

1

and Mr. Blasberg from the Board of Directors. Mr. Davidson contends that effort was designed to steal his intellectual property. Those efforts culminated in a vote of Board of Directors in late May of 2000 (4 ½ months after the Employment Agreement has been executed), which removed Davidson and Blasberg from the Board and reduced the number of directors to five (5).

3.      Davidson and Blasberg almost immediately commenced litigation in the Delaware Court of Chancery challenging the action of Board of Directors. (See Defendants Ex. H). As a result of that litigation, a Status Quo Order was issued by the Delaware Court essentially preventing Norehad, Gorman, and Best from engaging in any substantive action by the Corporation without the vote of either one of the 2 remaining members - James Rand and John Bienecke.

4.      As James Rand testified, that stand still then resulted in the Global Settlement Memorandum (G.S.M.) executed on September 20, 2001. (See Defendant's Ex. J).

5.       It is undisputed that, while P.E.C. made some payments to Mr. Davidson pursuant to the G.S.M. in 2001, that after January 1, 2002, no further payments were made to Mr. Davidson as required by the G.S.M. (See testimony of Mr. Davidson, Mr. Rand, and Mr. Blasberg).

6.      In October 2002, P.E.C. went into bankruptcy and was purchased by the plaintiff, N.P.E. in the bankruptcy proceedings.

7.      N.P.E. claims ownership of the Jumbo Patent (Plaintiffs Ex. 2) by virtue of  ¶1c. of the G.S.M.. Mr. Davidson contends that P.E.C. breached its contractual obligations and therefore ¶ 1c. is not binding. In the alternative of Mr. Davidson asserts ¶ 1c. does not operate as an immediate assignment but rather was contractual in nature and that the scope of N.P.E.'s claims is restricted to ¶ 1d. of the G.S.M. and resolution of "new inventiveness" v. "old inventiveness."

### *a. Operations at the South Carolina plant*

8. As I indicated, infra, the limited partnership PE-LP established and began operations of a plant designed to pasteurize eggs and bring them to the market in the spring and summer of 2000.  The operation began bringing pasteurized eggs to the market place sometime in early June of 2000. Almost immediately it became apparent that the eggs, within 3 weeks of being placed on the commercial market, were experiencing significant rot.  In a global effort to address the rot issues, Mr. Davidson and employees of PE-LP including Myron Wagner and Michael Myshrall undertook substantial efforts to address the rot problem.  Those efforts included but were not limited to the following;

   a. The removal of the chilling bath in the post-pasteurization process; and

   b. Trucking in fresh spring water for the use in the pasteurizing bath. (On the premise that local water was contaminated and contributing to the "rot" problem); and

   c. The implementation of an anti-bacterial agent to every phrase of the production process including but not limited to;

      a. The application to the eggs upon their arrival at the plant;

      b. The application through hand spraying and other means to the eggs prior to the entry into the pasteurization bath;

      c. The application of anti-bacterial agent (at first with hand spray) to the eggs upon their exit from the bath;

      d. The continued application of anti-bacterial agents through a wax coating and throughout the remainder of the process until the eggs were in the carton and ready to ship to market.

9. According to the testimony of Mr. Wagner and Mr. Myshrall, while it is quite clear that

the "rot" problem had been cured by the late summer or early fall of 2000, both Mr. Myshrall and Mr. Wagner testified that by the end of the year of 2000 they still had not identified the source of the rot. In particular, both witnesses testified that the rot problem was a product of a number of different factors including, the farms from which the eggs were purchased, the impurity of the water supply for the pasteurization baths, and solved in part by the elimination of the chilling baths, and the application of the anti-bacterial agent at all phases of the pasteurization process.

10. Moreover and quite by accident, as Mr. Wagner testified, he learned that by setting the temperatures in the pasteurization baths at two different levels that it was possible to maintain two uniform temperatures in the same bath. As demonstrated by the evidence that two temperature bath was first employed in South Carolina on November 8, 2000 (see Plaintiffs Ex. 51-Cheat Sheet for Procedure Changes).

11. There is no evidence that a three temperature bath as delineated by independent claim 27 and independent claim '48 of the '784 Patent was either tested or used prior to the calendar year of 2001. (See Plaintiff's Ex.1 '784 Patent)

### b. Patent Issues

### i. Overview of the Patent

12. The Patent as issued contains 74 claims. Of those claims 3 are independent.

13. The first independent claim is identified in ¶1 of the Patent and describes a method of pasteurizing in-shell chicken eggs, comprising four (4) elements. The 4th element is contacting the eggs with an antibacterial fluid containing an antibacterial agent claims. Claims 2 through 26 are dependant claims of claim 1 and include what is described as the Food Service element (claim #3), a jet fluid perturbation process (claim #6), and a jet fluid wall claim (claim #8).

14. The second independent claim is contained in claim 27 of the Patent and describes a method of pasteurizing in-shell chicken eggs comprising three (3) elements.

15. The 2nd independent claim is followed by dependant claims # 28 through 47. Those dependant claims include food service element (¶31) a jet fluid perturbation process (claim #32), and a jet fluid wall (claim #35),

16. Independent claim #48 describes a process for pasteurizing in-shell chicken eggs comprising 2 elements. That independent claim has 26 dependant claims comprising again food service element (claim #50), jet perturbation process, (claim #52) a fluid jet wall (claim #55) and the application of the antibacterial agent (claim #62).

17. In addition, independent claims 1, 27, and 48 contain the dependant claims of ambient air cooling (See claims #25, 26; claims #46, 47, and claims # 61, and 62).

18. Reduced to his essence the claims of inventiveness contained within the Jumbo include the following processes:

    a. Ambient air cooling;

    b. Application of antibacterial agent after the early exit of the egg from the heated bath;

    c. A three Temperature process for pasteurization that reduces the time for the process significantly;

    d. A jet fluid perturbation of the heated bath rather than air;

    e. A jet fluid wall component to the heated bath chambers;

    f. A food service process for distribution of the eggs to commercial markets i.e. restaurants, rest homes, and alike.

19. It is Mr. Davidson's claim that the Jumbo Patent as a whole constitutes "new

inventiveness" and as a result he owns the Patent.

20.    N.P.E. claims ownership of the Jumbo based upon two theories: ONE;  that the 12/20/02 office action summary by the U.S. Patent Office establishes the Jumbo is old inventiveness, and: TWO; that pursuant to ¶ 1 ( c ) of the GSM it is "old inventiveness".

21.    The plaintiff's claims must be rejected.

## II. CONTRACTUAL ISSUES

### a. The language "shall belong" of ¶ 1 ( c ) of the GSM does not operate as an immediate assignment of Mr. Davidson's intellectual property.

22.    The plaintiff attempts to characterize ¶ 1 ( c ) as being an immediate assignment of Mr. Davidson's intellectual property in the rubric of "old inventiveness".  The evidence fails to support that contention in several material ways.  It is beyond dispute that there is no language in the G.S.M. or any other document entered into evidence which utilizes traditional assignment language such as contained in original assignment by Mr. Davidson of 1/1/01 of the assignment of the 505 or 538.  There is no evidence that in fact any assignment was effected on the date of the signing of the G.S.M. and quite frankly no evidence that the parties to the agreement considered ¶ 1 ( c ) as an immediate and irrevocable assignment of intellectual property.

23.    First the language "shall belong" contemplates by the word "shall" a future event.

24.    Second, Mr. Davidson's testimony alone would contradict an intent by the parties at the time of the execution of the G.S.M. to treat ¶ 1 ( c ) as an automatic assignment.

25.    And there is independent evidence of intent of P.E.C. to the contrary. First, as Mr. Rand testified, the contract was drawn up by lay persons without the input of "lawyers".  When asked if ¶ 1 ( c ) was considered by him to be an immediate assignment, Mr. Rand responded with, "I don't know".  Moreover, there is ample evidence that less than two months after the execution of

the G.S.M., the parties had drafted a proposed agreement that specifically addressed intellectual property (See Defendant's Ex. OOO). It is clear that the intellectual property that would be the subject of ¶ 1 ( c ) continued to be the subject of further negotiations (See Defendant's Ex. OOO-1 and defendant's Exhibit GGG).

26.     Just as importantly the faxed correspondence from Mr. Rand to members of the Board of Directors of P.E.C. dated 7/20/01 (See Plaintiff's Ex. QQQ) is powerful evidence that neither P.E.C. nor Mr. Davidson considered ¶ 1 ( c ) to be an automatic assignment of intellectual property by Mr. Davidson as of the date of execution of the G.S.M.

### b. P.E.C. materially breached the G.S.M. and N.P.E., as its successor in interest, is not entitled to the Intellectual Property of Mr. Davidson whether it is "old" inventiveness or "new" inventiveness.

27.      Mr. Davidson respectfully incorporates those findings of facts and law contained within both Reply Brief to the Plaintiff's Trial Memorandum and the Plaintiff's Requests for Findings of Facts.

28.     Mr. Davidson's position is simple and straight forward. Pursuant to the provisions of ¶ 6 of the G.S.M. , the terms were to be binding but contemplated the preparation of further documents. Those further documents included further description of the intellectual property to be transferred by Mr. Davidson.

29.      Also the G.S.M. provided payments to Davidson pursuant to the salary portions of the G.S.M. which were to be made on a timely basis pending completion of the documents. (See Defendants Ex. J, ¶1 (a) (III). Mr. Davidson was to be engaged as a consultant to P.E.C. from September 20, 2001 through and including December 31, 2002 and Mr. Davidson was to receive a consultant fee of $17,500.00 per month without deduction for taxes (See G.S.M.).

30. While no additional documents were even agreed upon, there is uncontroverted evidence that by January 1, 2002, P.E.C. was either unable or refused to make payments to Mr. Davidson pursuant to it's contractual obligations.

31. It can hardly be said that the continued payments to Mr. Davidson beginning on January 1, 2002 were anything less than material in the contract sense of the word. From that it follows necessarily that P.E.C. was in material breach of the G.S.M. irrespective of the on-going contract negotiations from January 1, 2002 and thereafter through the filing of bankruptcy filed by P.E.C. in October of 2002.

32. Given that simple set of facts, Mr. Davidson is and was under no obligation to transfer intellectual property to P.E.C. As N.P.E. only owned what rights P.E.C. had at the time of the resolution of the bankruptcy proceedings. N.P.E. has no contractual rights in the intellectual property of John Davidson whatsoever.

### *c. Assuming Arguendo of the Applicability of ¶ 1 ( c ) and 1 (d) the applicability of the G.S.M, Mr. Davidson still owns the Jumbo.*

33. There is no question that the original language of the employment agreement executed on January 21, 2001 as to intellectual property is markedly different from the language contained in ¶ 1 ( c ) of the G.S.M. That agreement provides in pertinent part;

> "…inventions <u>conceived, developed or reduced to practice</u> "or tested or used by the company at a company facility, including a facility of a company contractor or licensee, or which has been the subject of a patent application" prior to January 1, 2001 shall be the company's exclusive property as against you."

<u>Emphasis</u> added.

34. In stark contrast, the language of ¶ 1 ( c) provides that;

> "…New processes or or intellectual property "inventiveness" <u>developed</u> prior to January 1, 2001 "Old inventiveness", including a method for extending the shelf life of pasteurized eggs by treatment of an anti-bacterial agent, shall be the

8

        property of P.E.C . ... . "

Emphasis added.

35. As the parties expressly negotiated the language of "old" inventiveness the Court should and must give the language of the G.S.M. its ordinary meaning. "Developed" prior to January 1, 2001 ("Old inventiveness") does not mean intellectual property that was conceived of prior January 1st of 2001.

36. With that in mind the language of ¶ 1 ( c ) is clear and unambiguous; developed means developed. The Merriam Webster Dictionary defines developed as "to make or create or produce especially by deliberate efforts over time; having high levels of industrialization". Certainly developed is not the equivalent conceived and an idea expressed in 2000 is simply not developed within the meaning of ¶ 1( c ).

37. Employing the common meaning of the word developed, the process of a three temperature bath as outlined in the Jumbo Patent (see claims 27 and 48, independent claims) are not "old inventiveness".

38. This construction of the contract is further supported by Ex. QQQ or the "Heads of Agreement Memo". It specifically addresses the multi- temperature process. The Memo outlines Mr. Davidson's requested changes, incorporates them as an attachment and the attachment is verbatim of the G.S.M. executed on 9/20/01 by the parties.

39. The language at page 2 of the Memo reads, "in as much as; 1) <u>we have already agreed on licensing at minimum the multi-temperature process".</u> There can be no reasonable interpretation but that the parties agreed that the multi-temperature process was "new" inventiveness and not developed prior to 2001.

40. Just as clearly, the processes of removing the chilling tank (ambient air cooling) and the

application of anti-bacterial agents were used in South Carolina in 2000 but were not the product of reasoned application of the inventiveness that is the subject of the patents. Again as Mr. Myshrall and Mr. Wagner make clear, those processes were two of many employed as response to the rot problem. Thus the question is whether those processes were developed prior to 2001. Here, based on the evidence in this case, it can only be said that those processes were only developed by ongoing testing and experimentation which continued throughout of 2000 and were not developed within the meaning of the contract until 2001. Those processes therefore are also "new" inventiveness within the meaning of the G.S.M.

41. Upon review, the language of 1 (d) to the definition of "new" inventiveness is once again clear and unambiguous. Inventiveness means what is says. There is no question that the Jumbo as issued contains many new areas of inventiveness. As indicated, infra,a; the service component of the inventiveness of the Jumbo developed entirely after 2001 b; The jet fluid wall component of the Jumbo (it appears as dependant claims in each of the three independent claims) were a new inventiveness developed after January 2001 and c; The Jet fluid perturbation element of the Jumbo patent, a process that was not even thought of prior to 2001 (see dependant claims 10, 11, 37, 57, 58 of Plaintiff's Ex. 1).

### III. CONCLUSION

42. This memo is not intended to be exhaustive of all issues. The defendant incorporates his Requests for Findings of Facts and Rulings of Law, his Motion to Dismiss (Motion for Judgment), made at the close of the plaintiff's case and at the close of all the evidence and his Motion in Limine with respect to inventiveness.

43. Based on the following, the Court should grant the following relief;

    A. Rule that L. John Davidson is the owner of the Jumbo;

B. Render judgment in favor of the defendant, L. John Davidson;

C. For such further relief as may be just.

>Respectfully Submitted,
>L. John Davidson,
>By his Attorney,
>
>**LAW OFFICE OF DAVID H. BOWNES, P.C.**

Date: July 27, 2011

>/S/ David H. Bownes, Esq.
>David H. Bownes, Esq.
>NH Bar No.: 277
>20 Canal Street
>Laconia, NH 03246
>(603) 524-4330
>office@dhblaw.net

## CERTIFICATION

I hereby certify that on this 27th day of July, 2011, that a copy of the Memorandum in Support of Judgment been forwarded to all parties of record via ECF.

>/S/ David H. Bownes, Esq.
>David H. Bownes, Esq.