```
              UNITED STATES DISTRICT COURT
              DISTRICT OF NEW HAMPSHIRE
```

National Pasteurized
Eggs, LLC

    v.                                                   Civil No. 07-103-JL

L. John Davidson

**SUMMARY ORDER**

Following a non-jury trial, this court issued lengthy and detailed findings of fact, rulings of law, and an order for judgment in favor of plaintiff National Pasteurized Eggs, LLC ("NPE") on its claim that it--rather than defendant L. John Davidson--owns United States Patent 6,692,784 (the "Jumbo"), covering a process for pasteurizing chicken eggs in their shells. Nat'l Pasteurized Eggs, LLC v. Davidson, 2011 DNH 208. NPE traced its ownership to an agreement (the "GSM") between Davidson and a now-defunct company he founded, Pasteurized Eggs Corporation ("PEC"), the assets of which NPE purchased after PEC declared bankruptcy.

The GSM provides, in essence, that PEC owned inventiveness developed prior to January 1, 2001, while Davidson owned inventiveness--so long as it "result[ed] in protection from new patents or patent applications providing broader or improved protection"--developed on or after that date. Id. at 14. Accordingly, whether the inventiveness claimed in the Jumbo was developed before or after January 1, 2001 was the principal

factual issue at trial.  Based on the evidence it received on this point, the court found that the inventiveness had in fact been developed prior to January 1, 2001, id. at 26, and, after rejecting Davidson's arguments as to the enforceability and interpretation of the GSM, ruled that NPE owned the Jumbo.

Since the judgment issued, Davidson has filed a motion to alter it, under Rule 59(e) of the Federal Rules of Civil Procedure, so that it awards ownership of the patent to him instead.  The motion is denied.  Generally, "Rule 59(e) motions are granted only when the movant shows a manifest error of law or newly discovered evidence."  Kansky v. Coca-Cola Bottling Co. of New Eng., 492 F.3d 54, 60 (1st Cir. 2007).  Davidson's motion, on its face, makes no attempt to demonstrate either.  Instead, he argues that this court erred in finding that (1) certain inventiveness embodied in the Jumbo was developed prior to January 1, 2001, (2) the GSM was an enforceable agreement, and (3) the GSM's conditions precedent to his assignment of the intellectual property were satisfied.  None of these conclusions was an error, let alone a manifest one.

First, Davidson challenges this court's finding that one aspect of the Jumbo, pasteurizing the eggs by passing them through zones of three different temperatures in a single tank of heated water, had been developed prior to January 1, 2001.  Nat'l Pasteurized Eggs, 2011 DNH 208, 8-9.  In making this finding,

this court relied on a memorandum that Davidson had written to PEC's patent counsel on November 14, 2000, i.e., before January 1, 2001.  Id. at 46.  The memorandum stated that "testing has been performed successfully" on essentially the same three-temperature process claimed in the Jumbo.  Id.

Davidson does not question that the memorandum adequately supports the court's finding that the three-temperature process was developed prior to January 1, 2001.  Instead, he complains that the court's reliance on the memorandum was "not warranted" in light of conflicting evidence, viz., the testimony of Davidson and another witness involved in developing the process, Myron "Mike" Wagner.[1]  As the court observed, Davidson testified that the memorandum reflected results that he had "anticipated" but had yet to actually occur, while Wagner testified that the discovery of the three-temperature process happened in 2001 because, he recalled, the discovery post-dated two other events

---

[1] Davidson also relies on statements from two other witnesses:  trial testimony by Mike Myshrall (who worked with Wagner in developing the pasteurization process) and a contemporary memorandum by Dan Best (who was a member of PEC's board of directors during some of the relevant events).  Neither is inconsistent with the court's finding.  Myshrall did not testify as to when the three-temperature process was developed, and none of his testimony as to when other events occurred undermines the court's conclusion on that point.  Best's memorandum simply told Davidson, in October 2001, that "the further multiple temperature work that you proposed doing is very important to get underway" (emphasis added).  It does not follow from this that the three-temperature process claimed in the Jumbo had not already been developed by then.

that happened that year.[2]  Id. at 8 & n.4.  The court specifically explained, however, that it chose to credit Davidson's contemporaneous memorandum rather than trial testimony by him expressing "newfound modesty as to the status of his inventions" or by Wagner, "who came across as an entirely forthcoming witness at trial, but was attempting to remember events that happened 10 years or so ago."  Id. at 9.

Faced with conflicting evidence on an important factual issue, then, the court simply chose to rely on Davidson's contemporaneous statement rather than trial testimony about events from roughly a decade earlier.  While Davidson

---

[2]In his Rule 59(e) motion, Davidson also points to a trial exhibit, which was entitled "Cheat Sheet for Procedure Changes" and was essentially Wagner's contemporaneous log of his work on the pasteurization process at PEC's South Carolina facility. Davidson argues that this document "demonstrates that the testing for the two temperature process in South Carolina did not begin until" November 14, 2000--the same day that Davidson sent his memorandum stating that the three-temperature process had been successfully tested.  The court specifically recognized, however, that the three-temperature process could not have been tested in South Carolina (before or after to January 1, 2001) because "the heat exchangers at the South Carolina facility were not powerful enough to accomplish that."  Nat'l Pasteurized Eggs, 2011 DNH 208, at 7.  Instead, the court found that the testing of the three-temperature process first occurred at a facility in New Hampshire where PEC, beginning in late 2000, had started manufacturing a new pasteurization machine to be used at a different plant.  Id.  Davidson does not question this finding. So the "cheat sheet," which described PEC's work in South Carolina, not in New Hampshire, does not undermine the court's finding that the three-temperature process was successfully tested before January 1, 2001.

4

understandably disagrees with this decision, it was no manifest error.  Indeed, "[w]here there are two permissible views of the evidence, the factfinder's choice between those competing views cannot be clearly erroneous."  Monahan v. Romney, 625 F.3d 42, 46 (1st Cir. 2010) (quotation marks omitted).

Davidson also argues at length that the claims of the Jumbo "should have an effective filing date" of the final patent application because the claims in the Jumbo as ultimately issued were not "disclosed" in the provisional applications and were "therefore developed after January 2001."  This conclusion simply does not follow from its premise.  As NPE points out, the relevant sections of the GSM did not assign inventiveness to PEC or Davidson depending on when it was "disclosed," but on when it was "developed."  So Davidson's claim that the inventiveness in the Jumbo was not <u>disclosed</u>, in publicly filed patent applications, until August 2001 at the earliest (even if accurate) is perfectly consistent with the court's finding that the inventiveness was <u>developed</u> prior to January 1, 2001.  That finding was not error.

Second, Davidson argues that the court was "simply mistaken" to rule that the GSM was an enforceable agreement, rather than an unenforceable "agreement to agree," as he had claimed at trial. This argument is deliciously ironic, in light of the fact that

Davidson has repeatedly stated in court filings--including his own counterclaim in this action--that the GSM "contained all the essential terms of the parties' agreements and was effective and enforceable as the agreement by its express terms." Nat'l Pasteurized Eggs, 2011 DNH 208, 29-30.  In any event, as the court observed, "'[a] written memorandum is sufficient to establish a contract if it demonstrates that the parties have manifested their intent to be bound to the essential terms of a more detailed forthcoming agreement,'" id. at 28 (quoting Lower Vill. Hydroelec. Assocs., L.P. v. City of Claremont, 147 N.H. 73, 75 (2001)), and the parties did so here in the GSM itself, which specifically states that it "will be binding until such time as further Settlement Documents are prepared and accepted," id.

Davidson does not quibble with the court's finding that this provision manifested the requisite intent to be bound.  Instead, he argues that this court's reliance on Lower Village Hydroelectric was "misplaced" because, there, the "further negotiations related only to minor details and were not essential to contract formation.  In this case, the details to be worked out were significant in nature, including the scope of the intellectual property" to be assigned.  But the GSM does address this issue:  as the court observed, "the GSM assigns ownership depending on whether patents were issued or applied for, or 'Inventiveness' was 'developed,' prior to January 1, 2001, and

6

sets forth detailed provisions for PEC to license any intellectual property assigned to Davidson." Nat'l Pasteurized Eggs, 2011 DNH 208, 27-28.

Davidson does not quibble with this observation either. Instead, he points to what he calls "an abundance of evidence that the parties continued to negotiate the scope and terms of" the GSM's assignment provisions. The court disagrees with this characterization of the record but, even taking it at face value, the fact remains that the parties specifically stated in the GSM that it was to be binding until further documents were drafted. That, again, manifested the requisite "intent to be bound by the essential terms of an agreement even though details remain to be worked out," and those essential terms were sufficiently spelled out in the GSM, as the court concluded. Id. at 27-29. This conclusion was not error, manifest or otherwise.

Third, Davidson argues that the court "ignore[d] the impact of specific conditions precedent" to his performance of the assignment under the GSM. In fact, even though Davidson never characterized any provisions of the GSM as "conditions precedent" in any of his arguments before, during, or after the trial, the court so construed his contention that he "was under no obligation to transfer intellectual property to PEC" because it had failed to honor certain payment obligations imposed by the GSM. Id. at 30. But the court ruled that, even though two of

these obligations amounted to conditions precedent, one had been satisfied and performance of the other--which called for Davidson to receive reimbursement for certain expenses at "the closing of the agreement"--had never become due because the "closing" never occurred. Id. at 31-32. Davidson essentially acknowledged as much in his trial testimony. Id. at 32.

Davidson now argues that this reading of the GSM "strains the bounds of reasonableness" insofar as it allows PEC "to sidestep" its obligation to pay Davidson "[s]imply because a settlement"--by which he presumably means the closing on the settlement--"was not achieved before PEC sought bankruptcy protection."[3] This is nothing more than a reformulation of Davidson's complaint that it is unfair to hold him to his promise to assign intellectual property to PEC since it dishonored its promises to make various payments to him. As this court has already explained, Davidson "exposed himself to this risk by signing the GSM," which "assigns the specified intellectual property without conditioning the assignment on . . . [PEC's] compliance with any of its obligations to him (save those

---

[3]It is not necessary, but it is worthwhile, to note that the effective date of the GSM was September 20, 2001, but PEC did not file for bankruptcy protection until more than a year later, on October 5, 2002. So Davidson's suggestion that it was PEC's bankruptcy filing that prevented it from closing on the GSM is inaccurate. If anything, it was Davidson's efforts to renegotiate the essential terms of the GSM after signing it that delayed the closing. Nat'l Pasteurized Eggs, 2011 DNH 208, 17.

expressly made conditions precedent . . .)." Id. at 37-38. Again, while one of those conditions precedent obligated PEC to reimburse Davidson for certain expenses, that reimbursement, by the express terms of the GSM, did not become due until the closing on the parties' agreement--and that never happened. PEC's "failure" to tender that reimbursement, then, had no effect on Davidson's assignment of the intellectual property which, in contrast, occurred upon execution of the GSM. Id. at 37. This conclusion was not error either.

Because Davidson has failed to show any manifest error in the court's findings and rulings supporting its judgment in NPE's favor, his motion to amend that judgment (document no. 159) is DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: March 2, 2012

cc: Peter G. Callaghan, Esq.
    Adam Taylor Rick, Esq.
    David H. Bownes, Esq.
    Paul C. Bordeau, Esq.